**HOBAN v. VILEY, Collector of Internal Revenue.**

**HOBAN et al. v. VILEY, Collector of Internal Revenue.**

Nos. 1778, 1779.

United States District Court
D. Idaho, N. D.
Aug. 17, 1951.

1. Plaintiff, Anita M. Hoban, during the taxable years involved in these suits, was the wife of Leo J. Hoban who died on June 17, 1948. Plaintiffs Joseph L. McCarthy, James F. McCarthy, Jr., and Anita M. Hoban are the duly appointed, qualified and acting executors and executrix of the estate of Leo J. Hoban, deceased.

2. Anita M. and Leo J. Hoban each filed an individual federal income tax return for the calendar years 1942, 1943, 1944 and 1945 with the defendant and each taxpayer paid to him the tax liability reported and assessed thereon. None of these payments are in controversy. Each taxpayer reported income upon the community property basis.

3. Separate deficiencies in tax and interest thereon were thereafter duly assessed upon each return for the calendar years 1943, 1944 and 1945 in amounts which were paid.

The partnership of Small Leasing Company had obtained a lease upon the Douglas Mine of the Douglas Mining Company, Ltd., a corporation, and also another lease from Hecla Mining Company, Federal Mining and Smelting Company and Hercules Mining Company, or from a trustee of these corporations, covering properties known as the Formosa operation.

In 1906, Hecla Mining Company, Federal Mining & Smelting Company, and Hercules Mining Company owned and operated lead-silver-zinc mines on Canyon Creek several miles above the City of Wallace, Idaho. Each of these companies owned its own concentration mill. Prior to the year 1907, all tailings resulting from the milling processes at these properties and from properties operated by other mine owners prior to that time, had been diverted into and permitted to flow down Canyon Creek, depositing part of the heavier mineral content containing lead, zinc and silver, in and adjacent to the floor of the valley, including the area leased and worked by the Small Leasing Company and both above and below the situs of the dam mentioned in the next paragraph, and thence into a larger stream to which Canyon Creek is a tributary.

Charles E. Horning Wallace, Idaho, Arthur H. Kent, San Francisco, Cal. for the plaintiffs.

John A. Carver, U. S. Dist. Atty., Paul S. Boyd, Asst. U. S. Dist. Atty., Boise, Idaho, John A. Rees, Washington, D. C., for the defendant.

CLARK, District Judge.

These suits were instituted by complaints filed May 8, 1950 for refund of Federal income taxes.

Jurisdiction is based upon Section 1340 of Title 28 United States Code.

They have been consolidated for all purposes other than the entry of judgment. The facts of the cases are as follows:

In the year 1907, the three companies aforesaid purchased a large acreage of land which was situated some distance below their respective mills, and through which Canyon Creek flowed, each company contributing to the cost of acquisition ratably in proportion to the tonnage of ore which was being milled by each of them. This acreage was located below a point where the valley of Canyon Creek widened and its floor flattened out to an appreciable extent. Prior to the working of the tailings deposited hereinafter described, the floor of the canyon, except for the bed of the stream, was fairly level with a considerable number of large tree stumps scattered over the flat, while the valley sloped to the southwest following the fall of Canyon Creek, the bed of the stream being approximately six (6) feet in depth. The stream tended to change its course down the valley from time to time. At flood stage, both before and after the construction of the dam, the waters of the stream spread out over the floor of the valley and deposited the heavier mineral bearing tailings. A dam was constructed in 1907 across Canyon Creek on the land thus acquired. This dam was used to intercept and impound a part of the tailings which in the absence thereof would have been carried on down the stream. The dam in question cost approximately $9,000 for its original construction, and about $2,000 additional was expended for maintenance, repairs and additions from 1907 to 1918, since which latter date, no further costs have been incurred. Depreciation was taken on the cost of the dam by the owner companies on a straight line basis. The said dam was about twenty (20) feet in height and about five hundred seventy-five (575) feet in length. The grade of the canyon at and immediately above the situs of this dam was about three (3) per cent. The lake formed by the water backed up by the dam extended about seven hundred (700) feet. This dam impeded the flow of said tailings down the stream and caused a portion of them to become distributed over the adjacent lands which had been purchased by the three companies aforesaid. The entire cost of said dam was borne and paid only by the three companies ratably to the tonnage of ores then being treated in their respective mills.

The lands so purchased, together with the large quantity of residual tailings which have been deposited thereon by the action of the waters of Canyon Creek, have at all times since 1907 been and are still owned by said three companies, either directly or beneficially through an individual holding the legal title thereto as trustee for their benefit. The floor of the valley of Canyon Creek, including the lands so purchased, was and is carpeted with large boulders and detritus. No commercial surface mineral deposit existed in the said area prior to the deposition by the tailings aforesaid by Canyon Creek.

The distribution of tailings above the aforesaid dam over the said land adjacent to the stream was not on a uniform basis, either as to quantity or as to grade in terms of metallic mineral content. The natural action of the stream had the effect of concentrating the heavier materials,— the tailings of higher grade, in channels and in deep spots and holes on the floor of the valley, while the lighter materials of lower grade had a tendency to feather out to the edges of the deposit or to escape over the spillway.

In addition to the tailings diverted into Canyon Creek by the mills owned by the three companies aforesaid, tailings were so diverted by certain mills upstream from the said dam owned and operated by other companies named below and prior to and after 1907. One of these mines and mills, the Tiger-Poorman, was acquired by Federal Mining and Smelting Company in 1904; the other, the Frisco, was acquired by Federal in 1914. Both of the foregoing companies were in operation for a number of years prior to the aforesaid acquisitions. In addition thereto, another mine, the Tamarack-Custer, owned and operated by other interests, began to divert tailings into Canyon Creek in 1917. Exhibit E appended to this stipulation contains data relative to the tonnage milled by the various mills whose tailings were diverted by the stream. The only mills above the said dam which diverted tailings into Canyon Creek prior

to the construction of the dam in 1907 were mills owned by the Hecla, Hercules and Federal Companies, or mills owned by predecessors in interest of these companies as aforesaid. It was not the practice of any of the mills diverting tailings into Canyon Creek to reflect the cost or value of these tailings in inventory on their books.

By virtue of this natural action of the stream, the tailings became mixed and blended with river gravel and boulders present on said land and minerals previously deposited thereon as the result of milling operations on Canyon Creek above the dam, as the result of which the deposit was found, in the course of Small Leasing Company's operations, to vary in depth from a few inches to about twenty-five (25) feet, with the natural river gravel and boulders constituting the major portion of the total materials.

In March 1942, said Small Leasing Company obtained a lease from the three companies aforesaid or their trustee, upon a large area of this land and tailings deposit. Since that time and throughout the taxable years involved in these actions, the said partnership has been engaged in recovering these metallic tailings from the leased land, milling them, and marketing the resulting metallic concentrates. Under the terms of this lease, Small Leasing Company was required to furnish all necessary tools and equipment and to defray all the expenses of its operations, including milling and concentration costs, as well as to assume the entire risk of financial failure in the undertaking, which was and is commonly referred to as "the Formosa Operation". Said partnership owned its own concentration mill, which is constructed and equipped at its own expense, with selective flotation being employed as the method of concentration.

The financial outlay by said Small Leasing Company for operating facilities, including the concentrator, sink-float plant, water wells, pipe lines, roads, trucks, screening equipment, power shovels and bulldozers, has been very substantial, amounting to over $117,000 by the end of 1946. Further substantial outlays have

since been made for a heavier power shovel and more trucks and screening equipment. The foregoing items constitute depreciable assets and appropriate deductions to provide for recoupment of their cost have been allowed by the Commissioner of Internal Revenue upon the audit of the partnership returns of Small Leasing Company in the computation of the net income for the taxable years involved in these actions. In addition to the aforesaid expenditures, said partnership found it necessary constantly to explore and sample the deposit in order to determine values and to locate and work the portions satisfying minimum standards of depth and richness in metallic content. The expenditures made in these prospecting, drilling and sampling operations were fully deducted as current expenses in the years incurred and such deductions have been allowed by the Commissioner of Internal Revenue upon the audit of the partnership returns in the computation of the net income for the taxable years involved in these actions. Large portions of the deposit could not be removed and milled at a profit for the reasons hereinabove stated.

The complaints and the formal claims for refund upon which these suits are predicated assert two issues. (1) That the Commissioner of Internal Revenue erroneously disallowed cost depletion claimed upon federal partnership returns filed by Small Leasing Company in the amounts of $35,914.44 for 1943 and $36,645.19 for 1944 with respect to gross income received from operations under what has been designated as the Douglas lease; and (2) That the Commissioner erroneously disallowed percentage depletion claimed upon the partnership returns in the amount of $14,543.40 for 1942; $39,097.42 for 1943; $41,340.33 for 1944 and $27,370.11 for 1945 with respect to gross income from what has been designated as the Formosa operation.

The plaintiffs since have waived so much of their claims involved in these actions as is based upon the asserted error of the Commissioner of Internal Revenue in disallowing the amounts claimed by Small Leasing Company as cost depletion on the Douglas lease operations in its partnership returns filed for the years 1942 and 1943.

The collector defends these suits upon the belief that all of the tax in question was lawfully due and owing when paid and that there is nothing in the record facts to support plaintiff's refund claims upon which their suits are predicated.

No jurisdictional question is presented. All of the tax in controversy was timely assessed. Formal claims for refund were timely filed. The claims were disallowed in full by the Commissioner of Internal Revenue and plaintiffs so notified by registered letters dated February 2, and each suit was timely filed.

The Statutes involved are Internal Revenue Code Sec. 23 26 U.S.C. § 23. Deductions from Gross Income:

In computing net income there shall be allowed as deductions:

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * * In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. * * *

"(n) Basis for depreciation and depletion. The basis upon which depletion, exhaustion, wear and tear, and obsolesence are to be allowed in respect of any property shall be as provided in section 114."

"§ 114. Basis for depreciation and depletion

* * * * * *

"(b) (As amended by Sec. 145(a), Revenue Act of 1942, c. 619, 56 Stat. 798) Basis for depletion

* * * * * *

"(4) Percentage depletion for coal, fluorspar, ball and sagger clay, rock asphalt, and metal mines and sulphur.—The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, in the case of metal mines, * * * 15 per centum * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph." 26 U.S.C. 1946 ed. § 114.

Revenue Act of 1943, c. 63, 58 Stat. 21:

"SEC. 124. Percentage Depletion For Flake Graphite, Vermiculite, Potash, Beryl, Feldspar, Mica, Talc, Barite, Lepidolite, And Spodumene.

"(a) In General.—So much of section 114(b) (4) (relating to percentage depletion for certain minerals) as precedes the second sentence thereof is amended to read as follows:

"(4) Percentage depletion for coal, fluorspar, flake graphite, vermiculite, beryl, feldspar, mica, talc, lepidolite, spodumene, barite, ball and sagger clay, rock asphalt, and metal mines, potash, and sulphur.—

"(A) In General.—The allowance for depletion under section 23(m) shall be, * * * in the case of metal mines, * * * 15 per centum, * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property."

"(c) Definition of Gross Income From the Property.—Section 114(b) (4) is amended by adding at the end thereof the following:

"(B) Definition of Gross Income From Property.—As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term 'ordinary treatment processes', as used herein, shall include

the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of sections 731 and 735." 26 U.S.C. 1946 ed. § 114.

The question presented is whether these Federal Statutes allow percentage depletion with respect to operations by a lessee in the extraction and processing of minerals recovered that included tailings which have been severed from a natural deposit and, in this instant case, whether the income derived by Small Leasing Company a partnership, from the operation known as the Formosa operation constituted income from an economic interest of said partnership in an ore deposit which was subject to the allowance for depletion provided by Sec. 23(m) of the Internal Revenue Code.

In this case the tailing deposit consists of partially processed ores that have been deposited upon land owned by the same parties who owned the mines from which such ores were originally produced. It is the defendant's contention that plaintiffs' case must fail for the reason that the tailings had been severed from the natural deposit and discarded by the original owners at the time of milling the ore.

There can be no question that the tailings were the discharge from the concentrating mills after the extraction of so much of the metallic mineral content of the ores treated as was commercially feasible at the time, and it is well known that since these tailings were deposited that new methods have been found to make the reprocessing profitable. It is admitted that there was no commercial surface mineral deposit in existence in the land on which these tailings were deposited prior to the time the tailings were deposited on it.

There is no question here, nor is it disputed, but what the owners of the mine or mines from which the tailings were originally produced are also the owners of the tailings deposited and also the owners of the land on which the tailings were deposited and that they were entirely within their legal rights in leasing the same to a lessee, giving the lessee the right to reprocess the tailings and to market the metallic minerals therefrom.

This being true, is the gross income from the Lessee's operation subject to the full statutory allowance for percentage depletion and should the same be equitably apportioned between the Lessor and the Lessee in proportion to their respective shares?

If there is an allowance for depletion it must be found in Sec. 23(m) of the Internal Revenue Code hereinbefore cited, which reads, in part, as follows: "Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case * *. In the case of leases the deduction shall be equitably apportioned between the lessor and lessee. * * * "

There is no suggestion in the argument presented by counsel for the defendant that the mine owners would not be allowed depletion in case they had themselves reprocessed the tailings but they base their

entire contention on the fact that the tailings had been severed from the natural deposits and removed from the mine and that the tailings had been discarded by the original owners.

There is nothing here to support the use of the word discarded, if that was their intention they would not have purchased the land on which the tailings were deposited by them, so the question narrows down to whether the income derived from the reworking of tailings deposit which consists of partially processed ores that have been deposited on land which has been acquired by the same parties who owned the mine from which such ores were originally produced is subject to percentage depletion allowance when the tailings have been deposited in a creek bed in which a dam was constructed by the mine owners to impede the flow of the tailings down the stream, causing them to overflow and to become distributed over the adjacent lands above the dam which has been purchased and was owned by the mining company. If this is answered in the affirmative then the question is: do the lessees have an "economic interest" in the mineral deposit in place which is depleted by production? If they do, the code provides "In the cases of leases the deduction shall be equitably apportioned between the lessor and lessee" and the lessee is entitled to his percentage depletion allowance.

Counsel for the defendant makes this statement: "The question in the instant case is primarily one of fact. The facts are not disputed and they are different from any of the described cases".

If this is true this Court could look to the Statute, applying the facts, and determine the issues here before it. However, I feel there are some decisions that are helpful in making that determination.

The basic statute is Sec. 23(m) of the Internal Revenue Code.

It was certainly the intention that owners of mining property are entitled to percentage depletion allowance. This can only be determined when the ores are treated; to treat the ore it necessarily follows that it must be severed from the natural deposit and it would certainly be unjust to say that the mining company would only be given one chance to extract all its values and no consideration given to a later reprocessing. This is settled in this, the Ninth Circuit in the case of Commissioner of Internal Revenue v. Kennedy Mining & Milling Co., 125 F.2d 399, and New Idria Quicksilver Mining Co., v. Commissioner of Internal Revenue and consolidated cases 144 F.2d 918. These cases establish that mill tailings are merely partially processed ore and that if such tailings are reprocessed by the party who owned the mine such party is entitled to percentage depletion allowance upon his income from the sale of the recovered mineral content of the tailings.

In these cases the Court announced the following rule of law:

"The tailings from which the taxpayer derived part of its gross income and all of its net income during 1935 and 1936 were ores. They were ores from the taxpayer's mine, just as were the newly mined ores which the taxpayer treated in 1935 and 1936. Income derived from the ores called tailings, as well as that derived from the newly mined ores, was income from the mine.

"It is true, but not material, that the ores called tailings were mined prior to 1935. The mining of ores and the receipt of income therefrom are seldom, if ever, simultaneous. The two events are usually months apart and not infrequently years apart. Thus income from a mine during a taxable year may, and usually does, include income from ores mined prior to that year.

"Nor is it material that these ores (now called tailings) were, prior to 1935, subjected to treatment whereby part of their gold content was removed. The ores so treated remained after such treatment, as they were before, the property of the taxpayer and were thereafter, as theretofore, ores from the taxpayer's mine. Income derived from their subsequent treatment was income from the mine, just as was that derived from their first treatment.

"It is likewise immaterial that the subsequent treatment of these ores (in 1935 and 1936) was in a cyanide mill instead of a

stamp mill. The right to deduct for depletion of a mine a percentage of the gross or net income therefrom does not depend upon the type of mill used in treating the ores from which such income is derived. Nor is the taxpayer's right to the deductions here claimed affected by the fact that prior to 1934, it claimed and was allowed deductions for 'unit' depletion in accordance with revenue Acts then in effect. * * *

"Atlas Milling Co. v. Jones, 10 Cir., 115 F.2d 61, cited by the Commissioner, is not in point. The taxpayer in that case was a contractor which had contracted with the owner of a tailings dump to treat the tailings therein for a share of the proceeds. Neither party to the contract owned any mine. The Court held, and rightly so, that income resulting from performance of the contract was not income from a mine."

Here we have a situation that differs somewhat from the ordinary tailing or waste dumps that have heretofore been presented to the Courts. On no conceivable theory can the so called tailings deposit here in question be regarded as personal property or as a unit of property having an existence separate from the land. It was not something resting upon the land and readily removable therefrom. The Mining Companies owning the mines from which the ore was mined and processed no doubt realized the values that would still remain in the tailings and purchased a large acreage of land which was situated in the valley some distance below their mills and through which Canyon Creek (into which the tailings resulting from the milling processes had been directed) flowed. Each Company contributed to the cost of this land in proportion to the tonage of ore which was being milled by each.

A dam was then constructed across the stream and valley near the lower end of the acreage so purchased. This dam operated to interrupt and impede the flow of tailings down the stream, causing them to overflow and to become distributed over the adjacent lands, above the dam, which had been purchased by the three companies as aforesaid. This expenditure, no doubt, would not have been made if there had been any thought on the part of the Mining Companies that these tailings were being discarded as waste material from their mining operations, in fact, I am forced to the opinion that this method of handling the tailings was a part of their mining operations, which they felt necessary to recover the full values of the ore mined by them.

By operation of natural forces the tailings diverted into Canyon Creek became reintegrated with the land and a part of it to such an extent that they could be removed therefrom only by a laborous process of digging and excavating, involving a complete disruption, not only of the surface of the land but for depths below the surface as deep as twenty-five feet. There can be little doubt that this deposit of tailings had become both in fact and in law a part of the land.

It is not necessary to decide whether the Mining Companies who had severed the ore from the ore in place originally would be entitled to depletion under the facts of this case, however, the cases of Commissioner of Internal Revenue v. Kennedy Mining and Milling Company, supra, and New Idria Quicksilver Mining Company v. Commissioner, supra, would seem to so hold although the facts here are somewhat different than the facts set out in those cases.

If this Court was to hold that New Idria Quicksilver Mining Co. v. Commissioner, supra and Commissioner of Internal Revenue v. Kennedy Mining & Milling Co., supra, were applicable here, if the tailings had been reprocessed by the owner Mining Companies, still the lessees would be barred from recovery as they, at no time, had an economic interest in the mineral deposits in place from which these tailings were derived; they are not in the same positions as the original mine owners would have been if they had carried on the operation of reprocessing the tailings. This seems to be well settled in the cases of Kohinoor Coal Co. v. Commissioner, 3 Cir., 171 F.2d 880, certiorari denied 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732 and Chicago Mines Co. v. Commissioner, 10 Cir., 164 F.2d 785, certiorari denied 333 U.S. 881, 68 S.Ct. 913, 92 L.Ed.

16

1156. These cases are not in conflict with the decisions of the Ninth Circuit cited above. In the Kohinoor case, supra, the Court held that the taxpayer had no interest in the coal in place; that its interest was confined solely to the coal in the dumps and that there was no occasion to ascertain the basis for depletion. The plaintiffs here have a similar interest. (As far as the original deposit in place is concerned these lessors had no economic interest and are not entitled to a depletion allowance). Where the owner of a tailing deposit, who is also the owner of the mines from which such tailings were originally produced leases the same and such tailing deposit is reworked by the lessee who by the terms of his lease has a right to complete the processing thereof and to market the metallic minerals recovered therefrom the gross income from the lessees' operation is not subject to the statutory allowance for percentage depletion. This appears to be well settled.

■ The alternate question presented by the plaintiffs is: Should the tailings deposit which was worked by the Small Leasing Company be regarded as a "mine or other natural deposit" within the meaning of the Internal Revenue Code?

There can be no doubt that we find here all the essential elements of a mining operation. Here is a large acreage of land that had no mineral value except the tailings deposited therein. In point of its physical characteristics the deposit was similar to a placer mineral deposit and the methods necessarily employed to recover the mineral content of the tailings were substantially the same as those used in large scale placer operations. It was necessary to do extensive exploration work and to strip and separate large quantities of boulders and other waste material which had become mixed with the metal bearing tailings. This was a man-made mine, the making of which was planned; title to the land was acquired, the tailings were allowed to flow in the stream running through it.

It is reasonable and just to say that because of its nature and physical characteristics the tailings deposit here should be recognized as a mining operation. There is no question in my mind but that as a matter of right there should be no distinction between a natural deposit and a man made one. However the right to depletion must be found in the Statute.

It appears to the Court that the case of Consolidated Chollar Gould & Savage Mining Co. v. Commissioner of Internal Revenue, 133 F.2d 440, 441 by the Ninth Circuit Court of Appeals is controlling as to this question. There the Court said in part:

"The deduction is a matter of legislative grace, White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172; New Colonial Ice Co., v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348, and the petitioner must bring itself clearly within the statute under which the deduction is claimed. * * *

"It is a rational interpretation of Sec. 23(m) that the word 'mines' is included in the concluding general classification of 'natural deposits.' If the dumps could be regarded as a mine, they are made by man and not by nature.

"Assuming the phrases of the section lend themselves to an alternative construction, that the word 'mines' is entirely disconnected from the phrase 'other natural deposits' and includes man-made mines, the ambiguity arising from the two possible rational interpretations must be resolved against the taxpayer seeking the deduction and which must bring itself clearly within the area of legislative grace.

"Petitioner contends that the deduction is warranted by our decision in Commissioner [of Internal Revenue] v. Kennedy Mining & Milling Co., 9 Cir., 125 F.2d 399. We do not agree. There we held the depletion deduction allowable because the recovery of mineral was from tailings of partially worked ore from a mine and mill owned by a taxpayer, deposited on taxpayer's land adjacent to the mine and mill from which they came, and hence the recovery was a mere continuation and completion of the processing of mineral extraction begun in the removal of the deposited material from the mine to the tailing dump. We distinguish that case from

Atlas Milling Co. v. Jones, 10 Cir., 115 F.2d 61. There the deduction was disallowed. The taxpayer extracting the ore from the tailings did not own the mine from which the tailings had come, and the tailings were held not a mine or other natural deposit."

So, like the above cited case this question must be resolved against the taxpayer.

Counsel for the defendant will prepare the necessary findings of fact, conclusions of law and decree in accordance with this opinion, serve copies and submit the original to the Court for approval.