## KOHINOOR COAL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9630.

United States Court of Appeals
Third Circuit.

Argued Oct. 19, 1948.

Decided Dec. 20, 1948.

Rehearing Denied Jan. 13, 1949.

James J. Dougherty, of Philadelphia, Pa. (John R. Scholl, of Philadelphia, Pa., on the brief), for petitioner.

Morton K. Rothschild, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., and Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before MARIS, GOODRICH and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

This appeal is taken from the decision of the Tax Court.

The question presented is whether the taxpayer is entitled to an allowance for percentage depletion with respect to its operations in the extraction and processing of coal from culm or refuse banks which it leased for that purpose from the owner and operator of a coal mine. The claim for depletion allowance is based upon Section 23(m)[1]; Section 114(b) (4) (A) and (B) as amended,[2] of the Internal Revenue Code; and Section 29.23(m)-1 of Treasury Regulations 111.[3]

The facts, which are not in dispute, may be summarized as follows:

The taxpayer, a Pennsylvania corporation, entered into an agreement with Turkey Run Fuels, Inc., on February 11, 1941, whereby it leased from Turkey Run, the owner, culm or refuse banks of material which Turkey Run had theretofore thrown aside in the operation of its anthracite mines. The lease was to run for ten years or a shorter period if the marketable coal was earlier exhausted from the refuse

---

[1] "Sec. 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

\*   \*   \*   \*   \*   \*

"(m) *Depletion.* In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \* In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. \* \* \*" 26 U.S.C.A. § 23.

[2] "Sec. 114. Basis for Depreciation and Depletion.

"(b) *Basis for depletion*

"(1) *General rule.* The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

\*   \*   \*   \*   \*   \*

"(4) (as amended by Section 145 of the Revenue Act of 1942, c. 619, 56 Stat. 798, and Section 124 of the Revenue Act of 1943, c. 63, 58 Stat. 21).—*Percentage depletion for coal mines* \* \* \*

"(A) *In general.* The allowance for depletion under section 23(m) shall be, in case of coal mines, 5 per centum \* \* \* of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. \* \* \*

"(B) *Definition of gross income from property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall

be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; \* \* \*". 26 U.S.C.A. § 114.

[3] Treasury Regulations 111, insofar as pertinent, is as follows:

"Sec. 29.23(m)-1. Depletion of Mines, \* \* \*—Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines \* \* \* a reasonable allowance for depletion \* \* \*.

"Under such provisions, the owner of an economic interest in mineral deposits \* \* \* is allowed annual depletion deductions. \* \* \* An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place \* \* \* and secures, by any form of legal relationship, income derived from the severance and sale of the mineral \* \* \* to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit \* \* \* does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest.

\*   \*   \*   \*   \*   \*

"(b) A 'mineral property' is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is

882

piles. The taxpayer was to pay a minimum annual rental of $24,000 and was granted the right to remove all coal from the refuse piles. It also agreed to pay all taxes on improvements and on the coal shipped, but not on the lands.

The taxpayer, in order to extract the coal from the culm or refuse banks, and to wash, size and load it for shipment, erected an anthracite breaker and installed other equipment and machinery at a cost to it of approximately $150,000. It then proceeded with the operations enumerated, during the taxable years.

In its return for the fiscal year ended June 30, 1943, the taxpayer computed depletion on a percentage basis, and claimed a deduction of about $22,000; in its return for the fiscal year ended June 30, 1944, the taxpayer elected to take depletion on a percentage basis, but did not claim the deduction because the question was being contested by the taxpayer for the earlier years. After the Commissioner disallowed the deduction for depletion for the taxable year ended June 30, 1943, and determined a deficiency upon other grounds for the fiscal year ended June 30, 1944, the taxpayer filed a petition for review of the Commissioner's determination with the Tax Court covering both years.

The Tax Court upheld the Commissioner in his determination of deficiencies in excess profits tax of $21,552.99 and $5,230.79 for the fiscal years ended June 30, 1943, and 1944, respectively.

The Commissioner contends (1) a culm bank is not a "mine"; (2) extraction of coal from a culm bank is not "mining"; and (3) there is absent the requisite "economic interest" for depletion allowance.

The taxpayer takes the position (1) whether a culm bank is a "mine" is immaterial; (2) extraction of coal from a culm bank is "mining" since Congress, in amending Section 114(b) (4) by adding paragraph (B), broadened the definition of the word "mining" to include not merely the extraction of ores or minerals from the ground, but also the ordinary treatment processes normally applied by coal mine operators such as cleaning, breaking, sizing and loading for shipment;

necessary for purposes of mineral extraction. The value of a mineral property is the combined value of its component parts.

"(c) The term 'mineral deposit' refers to minerals in place. The cost of a mineral deposit is what proportion of the total cost of the mineral property which the value of the deposit bears to the value of the property at the time of its purchase.

"(d) 'Minerals' include ores of the metals, coal * * *.

* * * * * *

"(f) The term 'gross income from the property', as used in sections 114(b) (3) and 114(b) (4) (A) and sections 29.23 (m)-1 to 29.23(m)-19, inclusive, means the following:

* * * * * *

"In the case of a crude mineral product other than oil and gas, 'gross income from the property', as used in section 114(b) (4) (A), means the gross income from mining. The term 'mining' as used herein includes not only the extraction of ores or minerals from the ground but also the ordinary treatment processes which are normally applied by the mine owners or operators to the crude mineral product after extraction in order to obtain the commercially marketable mineral product or products.

* * * * * *

"The term 'ordinary treatment processes', as used herein, shall include the following:

"(1) In the case of coal—cleaning, breaking, sizing, and loading for shipment;

* * * * * *

"(g) 'Net income of the taxpayer (computed without allowance for depletion) from the property', as used in section 114(b) (2), (3), and (4) and sections 29.23(m)-1 to 29.23(m)-19, inclusive, means the 'gross income from the property' as defined in paragraph (f) of this section less the allowable deductions attributable to the mineral property upon which the depletion is claimed and the allowable deductions attributable to the processes listed in paragraph (f) in so far as they relate to the product of such property, including overhead and operating expenses, development costs properly charged to expense, depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion. Deductions not directly attributable to particular properties or processes shall be fairly allocated. * * * *"

and (3) it has the requisite "economic interest."

Certain well-established principles are applicable in the determination of the issue. They are:

■ In order to determine whether a taxpayer is entitled to an allowance for depletion under Section 23(m) we must recur to the fundamental purposes of the statutory allowance. The deduction is permitted as an act of grace. The depletion allowance permitted as a deduction from the gross income in determining the annual taxable income of mines represents the reduction in the mineral content of the reserves from which the product is taken. The reserves are recognized as wasting assets and the depletion allowance is intended as a compensation for the part used up in production. United States v. Ludey, 1927, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054; Helvering v. Bankline Oil Co., 1938, 303 U.S. 362, 366, 58 S.Ct. 616, 82 L.Ed. 897.

■ The right to depletion allowance does not depend upon the particular legal form of interest enjoyed by the taxpayer in the mineral content of the land. It is sufficient if one, as lessor or lessee, has an "economic interest" in the mineral deposit "in place" which is depleted by production. The phrase "economic interest" is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who does not have a capital investment in the mineral deposit. There must exist some element of "ownership" in the mineral deposit "in place" and a right to share in its production in order to entitle one to depletion allowance. The mineral deposit "in place" must be a reservoir of capital investment of the taxpayer claiming the allowance. Lynch v. Alworth-Stephens Company, 1925, 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660; Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L. Ed. 489; Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324.

The principles stated were applied in several cases in which the fact situations were strikingly analogous to that here. In Helvering v. Bankline Oil Co., supra, the taxpayer entered into contracts with oil producers for the treatment of wet gas by the extraction of gasoline. Natural gas, commonly known as "wet gas", as it flows from the earth is not a salable commodity. It is only through processing—by separation of the gasoline therefrom—rendering it dry, that it may be sold for commercial use. Conversely, it is only through the separation of dry gas from wet gas that the gasoline is salable. The taxpayer's contracts provided, generally, that it should (1) install and maintain the necessary pipe lines and connections from casingheads or traps at the mouth of the well to its plant, through which the producers agreed to deliver the natural gas produced at the well; (2) extract the gasoline from the wet gas; and (3) pay the producers one-third of the total gross proceeds derived from the sale of the gasoline so extracted, or, at the producers' option, to deliver to them one-third of the gasoline itself.

The taxpayer, under its contracts, took no part in the production of the wet gas. It did not conduct drilling operations on the producing premises. It did not pump oil or gas from the wells. It did not have an interest as lessor or lessee in any of the producing wells. It merely attached pipe lines to the wells, carried the gas from those wells to its plant and extracted the gasoline therefrom.

The then Board of Tax Appeals found that the taxpayer had no depletable interest.[4] It was reversed by the Circuit Court of Appeals for the Ninth Circuit [5] on the ground that the taxpayer, under its contracts, had acquired an "economic interest" in the wet gas "in place" and was thus entitled to depletion allowance. The Supreme Court of the United States reversed. Said the Court, 303 U.S. at page 367, 58 S.Ct. at page 618, 82 L.Ed. 897:

"It is plain that, apart from its contracts with producers, respondent (taxpayer) had no interest in the producing wells or in the wet gas in place. Respondent (taxpayer) is a processor. It was not en-

---

4 1936, 33 B.T.A. 910.　　　5 1937, 90 F.2d 899.

gaged in production. Under its contracts with producers, respondent (taxpayer) was entitled to a delivery of the gas produced at the wells, and to extract gasoline therefrom, and was bound to pay the producers the stipulated amounts. * * * The pipe lines and equipment, which respondent (taxpayer) provided, facilitated the delivery of the gas produced but the agreement for their installation granted no interest in the gas in place. Nor was such an interest created by the provision for payment for the gas delivered, whether the payment was made in money out of the proceeds of the gasoline extracted or by delivery of the agreed portion of the gasoline. * * *

*"Undoubtedly, respondent (taxpayer) through its contracts obtained an economic advantage from the production of the gas, but that is not sufficient. The controlling fact is that respondent (taxpayer) had no interest in the gas in place. Respondent (taxpayer) had no capital investment in the mineral deposit which suffered depletion and is not entitled to the statutory allowance."* (Emphasis supplied.)

In the companion cases of Chicago Mines Co. v. Commissioner and London Extension Mining Co. v. Commissioner, 10 Cir., 1947, 164 F.2d 785, certiorari denied, 1948, 333 U.S. 881, 68 S.Ct. 913, the facts were as follows:

A former owner of a mine dumped on the surface of the land tailings from the mine which consisted of waste material and low-grade ore. One of the taxpayers, London Company, which also had an ownership interest in the mining property, acquired the working lease to the underground mine and, as an incident to the lease, the right to work the dump. During a portion of the taxable period, it granted to its wholly-owned subsidiary, Chicago Mines Co., a lease entitling it to sort and mill the contents of the dump. Chicago Mines Co. was to pay London Company a royalty on the net smelting returns. During the remaining portion of the taxable period, the London Company itself worked the dump. The Court held that the dump was not a "mine" under Section 23(m); that no deduction for depletion with re-

spect to it could be taken by the London Company, since the dump was not created by it and was not operated as an integral part of its underground mining operations; and that its subsidairy, the Chicago Mines Co., which did not even have a collateral interest in the mining property, was not entitled to a depletion deduction on its operations in sorting and milling the contents of the dump. Said the Court, 164 F.2d at page 787:

"A 'mine' is an excavation in the earth from which minerals are removed by digging or other mining processes. In its broader sense, it is understood to mean the vein lode or deposit of minerals. This seems to be the sense in which the term 'mine' is used in Section 23(m). The language employed is 'Mines, oil and gas wells, *other natural deposits * * *.'* Mining thus connotes the removal of minerals from a natural deposit and does not include the reworking of mineral dumps from the surface of the earth artificially created and resulting from mining operations. Tailings from a mine, consisting of waste material and low-grade ore placed upon the surface of land, become personal property, and the dump in a true sense does not become a mine. We adhere to what we said in the Atlas case ([Atlas Milling Co. v. Jones, 10 Cir.], 115 F.2d [61], 63) that, 'The word "mines" as used in paragraph 23(m) * * * is limited to natural deposits and does not include a tailings dump deposited on the surface of land, consisting of the residue of ore that has been severed and milled.'"

In our opinion the Bankline Oil and the Chicago Mines decisions are dispositive of the instant appeal.

The lease in the case sub judice merely granted the taxpayer

*"* * * exclusive right and privilege of loading, preparing and taking away, wholly at its own cost, risk and expense all the coal contained in all those certain coal, culm and refuse banks known as the Kohinoor and the West Shenandoah Colliery culm banks. * * * together with the right to use, during the term hereof, such parts of the surface on which the banks are located as are required for the*

operation of said banks." (Emphasis supplied.)

And further,

"To Have and to Hold the said grants, rights and privileges during the term of ten (10) years, beginning at twelve o'clock noon on the first day of January 1941 and ending at twelve o'clock noon on the first day of January 1951, at which time *all the right of the said Lessee to the said coal, culm and refuse banks, lands and the rights and privileges herein granted and demised shall fully end and terminate, unless sooner determined by the exhaustion of the marketable coal in said banks.*" (Emphasis supplied.)

That the lease did not grant the taxpayer any rights to the coal "in place" or to the natural deposits of the coal is further made apparent by Section II which under the caption "Surface Rights" states:

"The said Lessee shall and *will use the surface herein designated for washery and culm bank purposes only,* including the right to erect and maintain buildings on the demised premises to be used in connection with the operation thereon * * *" (Emphasis supplied.)

The situation of the taxpayer in the instant case is analogous to that of the taxpayer in the Bankline Oil case and particularly the taxpayer in the Chicago Mines case. Here the taxpayer, having no interest in the coal in the mine itself, resembles his counterpart in the Chicago Mines case where there was also absent an interest in the ore in the mine, and the taxpayer in the Bankline Oil case which had no interest in the gas well.

Pertinent also is Atlas Milling Co. v. Jones, 10 Cir., 1940, 115 F.2d 61, certiorari denied 312 U.S. 686, 61 S.Ct. 613, 85 L.Ed. 1124, which was cited with approval in the Chicago Mines case. In that case the St. Louis Smelting and Refining Co. carried on lead and zinc mining operations. The residue of its operations, known as tailings, was deposited on the surface of the land. About eight years after the St. Louis Company ceased operations, the taxpayer, Atlas Milling Co., entered into separate contracts with the owner of a life estate in the land and the tailings deposited thereon, and the owner of the remainder interest in the land, giving it the right to process the tailings on a royalty basis. Its claim for a depletion allowance was denied on the ground that the tailings did not constitute a "mine" and that the processing operations did not constitute "mining".

The taxpayer's contention here that Section 114(b) (4) (B) as retroactively added by Section 124(c) of the Revenue Act of 1943 has broadened the meaning of the term "mines" in Section 23(m) to include the extraction and processing of coal from a culm bank was also raised in the Chicago Mines case. We are in accord with the ruling there that such a contention cannot be sustained.

Section 114(b) as amended deals with the *basis* for depletion, and does not come into play unless the taxpayer has an economic interest in a "mine" or natural deposit within the meaning of Section 23(m), which is defined in Treasury Regulations 111 as "minerals in place". In view of the fact that the culm and refuse banks were not a "mine" within the meaning of Section 23(m) because they are not a natural mineral deposit, there is no occasion to ascertain the basis for depletion.

In view of the above, we are of the opinion that since the taxpayer had no interest in the coal "in place" and its interest was confined solely to the coal in the culm or refuse banks which had already been extracted from the earth, it is not entitled to depletion allowance and the decision of the Tax Court will be affirmed.