**SOIL BUILDERS, INC., Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 17962.

United States Court of Appeals
Fifth Circuit.
April 22, 1960.

Joseph W. Price, III, Philadelphia, Pa., Clarence G. Ashby, Jacksonville, Fla., Sanford D. Beecher, Duane, Morris & Heckscher, Philadelphia, Pa., Adair, Ulmer, Murchison, Kent & Ashby, Jacksonville, Fla., of counsel, for appellant.

Helen A. Buckley and Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Edith House, Asst. U. S. Atty., Jacksonville, Fla. Howard A. Heffron, Acting Asst. Atty. Gen., Dept. of Justice, Charles K. Rice, Asst. Atty. Gen., Melva M. Graney, Attorney, Department of Justice, Washington, D. C., E. Coleman Madsen, U. S. Atty., Miami, Fla., for appellee.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

The taxpayer here appeals from a judgment n. o. v. entered by the trial court in a suit for recovery of income taxes based on the refusal of the Commissioner of Internal Revenue to recognize as subject to percentage depletion the income from the sale of colloidal

phosphate recovered as "tailings" from an earlier mining of hard rock phosphate.

Appellant's suit was predicated on Section 23(m) and Section 114(b) (3) and (4) of the Internal Revenue Code of 1939.[1] These sections provide that "In the case of *mines*, oil and gas wells, *other natural deposits* and timber, a reasonable allowance for depletion" shall be allowed in computing net income. (emphasis added). For "phosphate rock" the allowance fixed by Congress is 15 per cent.

The facts, practically undisputed, but in any event taken most strongly in favor of appellant, are:

During the years around 1900 in the Florida country in and around Citrus County there was considerable mining activity directed toward taking out of the ground hard rock phosphate. This mineral was found in the form of a "matrix", as all witnesses described it, i. e., a frame or block of hard phosphate with openings filled with sand, clay and soft particles of phosphate. The chunks or matrices were removed from the ground, subjected to a tumbling and washing process over a screen; the hard bits of phosphate were thus retained, treated with chemicals and used as a liquid fertilizer or fertilizer ingredient. The washing cleaned out of the openings in the matrix all except the hard rock. Thus, sand and clay and fine particles of phosphate passed through the screen and were discharged onto the ground or into natural watercourses; this resulted in the immediate deposit of the sand and the heavier clay particles and the carrying to the final resting point of the water, of the light particles (called colloidal phosphate by the parties)[2] where they slowly drifted to rest on the bottom or remained in suspension until the water evaporated. Over the years the additions of such washings built up accumulations of colloidal phosphate. While obviously such accumula-tions might have been found in the immediate vicinity of the mining and washing operations if the run-off water was permitted to stand there, the evidence was to the effect that these accumulations usually occurred from a quarter to half a mile from the mining activity.

Beginning some forty years after the accumulations had thus occurred and after they had been covered over, some by soil, some by vegetable matter, some by thick growth of brushes and even trees, it was realized that concentrated deposits of colloidal phosphate had commercial value as a fertilizer. Taxpayer and others searched for it, removed the overburden, dug it up and, after permitting it to dry, removed and bagged it for commercial use. It is this product that taxpayer claims meets the statutory definition of "phosphate rock" and which it claims is found either "in the case of mines" or in "the case of other natural deposits." Only if it meets these tests can the product be entitled to depletion.

The trial court overruled the government's motion for a directed verdict and submitted the case to the jury which found for the taxpayer. Thereafter, upon motion, the court entered a judgment for the United States notwithstanding the verdict.

There being no question of fact touching on what the taxpayer actually did, the only question being whether the admitted facts bring the product within the statutory definition of "mine", "natural deposit", and "phosphate rock", the trial court did not err in concluding that it was not bound by the jury's verdict.

We conclude, as did the trial court, that the admitted facts did not bring the appellant's activities within the depletion statutes.

In addition to the facts already recited, it is undisputed that the colloidal phos-

---

1. 26 U.S.C.A. Internal Revenue Code (1939), as amended, Section 23(m) and Section 114(b) (3) and (4).

2. Webster's New International Dictionary (unabridged) gives these definitions: "colloidal: of, pertaining to, or of the nature of a colloid or colloids; colloid: (1) physical chemical. (1) (a) a substance that when apparently dissolved in water or other liquid, diffuses not at all, or very slowly through a membrane etc.,".

phate that was here removed from the ground and sold was *not* in its natural state. It obviously was a highly concentrated mixture of phosphate bearing clay, or pure phosphate.[3] Moreover it is quite difficult to understand how this material, consisting of such fine particles that it remains in suspension in water until the water evaporates, could be called phosphate *rock*. Actually what was being removed and sold was colloidal phosphate. What had been mined in 1900 was phosphate rock. This precise point is not pressed by the appellee, and we note it only because we are told by the appellant that its case depends on the proposition that what it is "mining" today is a different mineral than what was mined in the form of hard rock phosphate. In demonstrating the difference the appellant terms the present product "soft rock phosphate".

Appellant concedes that the decided cases are against it if its activity was a second effort to obtain the same minerals by reworking the "tailings" of an earlier mining operation. See Atlas Milling Co. v. Jones, 10 Cir., 115 F.2d 61, certiorari denied 312 U.S. 686, 61 S.Ct. 613, 85 L.Ed. 1124, which appellant says is the "leading case in this line." See also Consolidated Chollar Gould & Savage Mining Co. v. Commissioner, 9 Cir., 133 F.2d 440; Chicago Mines Co. v. Commissioner, 10 Cir., 164 F.2d 785, certiorari denied London Extension Mining Co. v. C. I. R., 333 U.S. 881, 68 S.Ct. 913, 92 L.Ed. 1156; Kohinoor Coal Co. v. Commissioner, 3 Cir., 171 F.2d 880, certiorari denied 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732, and Hoban v. Viley, 9 Cir., 204 F.2d 459. In all these cases, appellant says, the effort on the re-working activity was to recover more of the same mineral that had been the object of the original mining. This, the appellant says, distinguishes the cited cases from the present case.

It is extremely difficult to see how it can be said that a different mineral is being sought in 1940 than that sought in 1900. It cannot be doubted that the "hard rock phosphate" was in actuality "phosphate rock", the term used in the depletion section of the statute. Therefore, if it had been mined since enactment of the percentage depletion provisions, it would have been depletable at

3. The testimony of Mr. Ingle was undisputed on this point:

"Q. Now, how does the colloidal phosphate that is mined down in Citrus County come into being? A. Well, a lot of this particular, I'd say all of it in the earlier times, came about rather by accident in which man approximates—well, in fact, it is the same thing that happens in nature where a stream flowing into a lake, you'll get a deposition of sand where the stream goes into the lake because those particles are heavier and settle out when the water loses its velocity, and in turn each lighter particle, or each particle that is finer and tends to remain in suspension, is deposited further.

"In dumping the tailings from the washing pit, at the immediate point of discharge would accumulate small pieces of hard rock phosphate, sand, and sand particles. These in turn, would have a low angle of repose, a very gentle angle of repose, and the *water would travel* from this point of discharge *to some place where*—to the point where *it had no further exit*, and this colloidal phosphate, being very fine, remained in suspension. Then probably part of it would settle to the bottom with time, but other of it was so fine that, eventually, *it waited until* the water evaporated *and was concentrated in these spots.* (Emphasis supplied.) * * *

"Q. Now, this colloidal residue that you have mentioned, is that the colloidal residue that is presently being mined in Citrus County? A. That is the product that is being mined in Citrus County as colloidal phosphate.

"Q. Is colloidal phosphate that is found in the natural state, in other words, colloidal phosphate that is not a part of these tailings or washings, ever mined for use in commercial purposes? A. Only as a part of the matrix. It's never mined; so far as I know, none has ever been mined for commercial purposes directly from the ground.

"Q. Is the colloidal phosphate that is mined from the ground found in a natural state? A. (No response).

"Q. Do you understand my question or have I used the wrong term? A. Is the deposit suitable for commercial purposes found in the ground as a natural occurrence?

"Q. Yes. A. No."

15 percent. Here, appellant, claims the right to take depletion under the same named mineral, "phosphate rock." If this substance is rock at all, then it seems to follow that it is an effort to rework the "tailings" of a mine in an effort to extract the same minerals, the obstacle to recovery in all the cases cited by the appellant.

The taxpayer here is faced with an even greater difficulty. That is, that no subtlety of reason or advocacy can bring the accumulations here within either the term "mines" or the term "natural deposits." The colloidal phosphate not only is not in its natural location; it is not even in its natural state. In effect, it is a refined product, refined by the removal from it of all sand (silica oxide) and non-phosphate clay. The refinement process and the removal process were one and the same. By this process a deposit was undoubtedly made, but it was not a natural deposit; it was manmade.

The Tax Court case, Pacific Cement & Aggregates, Inc., v. Commissioner, 31 T.C. 136, is not persuasive of appellant's claim. There, sand and gravel had been run through a dredge and sifted for gold, a mineral entitled to depletion; the gravel and sand that came out of the dredge was redeposited in place. There was no crushing or processing of the aggregates. The only change was in extracting the gold. Later another owner removed the aggregates and claimed depletion at the rate specified in the statute for that product. The Tax Court held that since there had been no previous working of the property for aggregates (sand and gravel) but only for gold, an entirely different mineral, and since the aggregates were in general in the same spot from which they had been taken, depletion was allowable. Without intending to indicate either acceptance or rejection of the reasoning of the Tax Court in that case, the distinguishing facts here are (1) that the taxpayer claims the deduction under the classification of phosphate rock, which is exactly what was previously mined, and (2) that

the colloidal phosphate here was not, when removed, either a natural deposit or in its natural state.

We conclude that the judgment of the trial court was required under the applicable statutes. It is affirmed.