**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**CLAUDE C. WOOD COMPANY, Respondent.**

No. 18224.

United States Court of Appeals Ninth Circuit.

July 30, 1963.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Michael Mulroney, and Carolyn Just, Attys., Dept. of Justice, Washington, D. C., for petitioner.

Robert H. Mullen, Lodi, Cal., for respondent.

William E. Coombs, Rialto, Cal., amicus curiae.

Before MADDEN, Judge of the Court of Claims, and JERTBERG and DUNIWAY, Circuit Judges.

JERTBERG, Circuit Judge.

Before us is a petition by the Commissioner of Internal Revenue to review a decision of the Tax Court of the United States holding that the taxpayer is entitled to deduct, in his 1958 income tax return, a percentage depletion on rock, sand and gravel which he had removed from property which had previously been dredge-mined for gold by another party.

The following summary of facts is taken mainly from the petitioner's opening brief to which taxpayer offers no serious dissent.

The taxpayer, a California corporation, operates a rock, sand and gravel business. In 1958, the taxable year in question, it operated from the Featherston, Putman Ranch and Wright properties in San Joaquin County, California. Its operations on all three properties were carried out under agreements which gave it the exclusive right to remove the rock, sand

and gravel which had been unearthed in prior gold dredging operations on the land by other parties.

The agreement relating to the Featherston properties provided that the taxpayer would pay to the owner of the property a stated rate per ton, subject to an agreed minimum payment, for all rock, sand and gravel removed from the property. The agreement under which the taxpayer operated on the Putman Ranch property was similar. The agreement under which the taxpayer operated on the Wright property provided that the owner of the property sold to the taxpayer for $9,375.00 all rock, sand and gravel remaining on the property. The taxpayer operated under these agreements during the taxable year in question.

The Putman, Wright and Featherston properties had never been mined for aggregates by any other person or by any prior owner, and no aggregates were removed from these properties until the operations were commenced by taxpayer.

Gold dredging operations preceded the taxpayer's operations on the property. Before the gold dredging operations commenced, the general geologic cross section of the properties was bedrock on top of which was an alluvium deposit 30 to 40 feet thick. The alluvium contained aggregates of sand, gravel and cobbles. When in place as an alluvial deposit, sand and fine gravel filled the voids between the cobbles. Free gold was also intermingled with the sand, gravel and cobbles. On top of the aggregates was a layer of topsoil and vegetation.

In determining whether a property was suitable for dredge mining for gold, borings were taken to determine the gold content, the character of the sub-surface, and the depth at which bedrock lay. If the property was acceptable, the topsoil and vegetation were removed to expose the alluvium. A pit was then dug in which the dredge was constructed on a watertight platform. The pit was flooded to float the barge.

The dredge was a ponderous machine. The barge was 150 feet long. Extending forward from it was a digging ladder 75 feet long bearing scoops on a conveyor belt which dug and carried the gold-bearing aggregates to the barge. Extending backward from the platform was a stocking ladder, an arm 125 to 150 feet long, which conveyed gravel and cobbles from the barge to deposit them behind the barge.

The dredge in operation scooped up all the material above bedrock with the scoops at the end of its digging ladder and conveyed the material to the barge. There, the aggregates were tumbled in a trammel, a cylindrical rotating perforated screen, in which they were washed and screened to separate the small particles of gold and sand from the unwanted gravel and cobbles. The gravel and cobbles were then conveyed 150 feet backward to the end of the stacking arm and dumped. Quicksilver separated the gold from the fine sand with which it had passed through the trammel screen and the sand was discharged into the pond immediately behind the barge. Thus, the gravel and cobbles were moved from their original position at any given point on the property some 300 to 350 feet while the sand from the same place was moved above 200 to 225 feet. The dredge dug its way about the property by displacing the material in front of it and depositing it behind. The sand was discharged closest to the machine while the cobbles and gravel were later deposited on top as the dredger moved forward. Since the voids in the gravel and cobbles deposited by the dredger were not filled with sand as in their natural state, the volume or "swell" of the discharged aggregate was 35 to 40 percent greater than it had been in the natural state.

The cross section of property which has been worked by a dredger of this sort is bedrock, covered by a layer of sand which in turn is covered by a layer of gravel and cobbles with no covering of topsoil.

The dredge's function was one of separation and displacement rather than crushing or grinding of the aggregates it dug. No chemicals were added to the aggregate.

The deposits remaining after the dredge had worked a property are customarily called a tailing pile.

Taxpayer dug such deposits from the place in which the dredging operation deposited them with draglines and hauled them to its plant for processing. At the plant the sand, gravel and cobbles were processed into the kinds of rock and sand products which the taxpayer sells.

The taxpayer's processing operations differ for dredge and natural aggregate materials. With natural materials sand and rock are mixed, but with dredged materials they have been separated.

On its 1958 income tax return the taxpayer claimed a percentage depletion deduction of 5 percent on the material from the three properties. The Commissioner disallowed the deduction and the taxpayer petitioned the Tax Court.

The tax court found that "the aggregates taken from the Putman, Wright and Featherston properties in the year in question were natural deposits that were mined by the taxpayer."

The Tax Court concluded that the taxpayer was entitled to the deduction.

Section 611 of the Internal Revenue Code of 1954, in its pertinent part provides "[i]n the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term 'mines' includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). * * * "

Section 613(a) and (b) (5) (A) of the 1954 Code provides that the percentage of depletion for sand and gravel shall be 5% of the gross income from the property.

Section 613(c) (1) provides that "[t]he term 'gross income from the prop-erty' means, in the case of a property other than an oil or gas well, the gross income from mining." Section 613(c) (2) provides that "[t]he term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes," etc. Section 613(c) (3) provides that "[t]he term 'extraction of the ores or minerals from the ground' includes the extraction by mine owners or operators of ores or minerals from the waste or residue of prior mining. The preceding sentence shall not apply to any such extraction of the mineral or ore by a purchaser of such waste or residue or of the rights to extract ores or minerals therefrom."

The Commissioner did not question in the Tax Court, nor does he question here, the fact that the taxpayer had an economic interest in the properties involved.

The specifications of error relied upon by the Commissioner are that:

"The Tax Court erred—

"1. In finding that the aggregates taken by the taxpayer from three properties in 1958 were natural deposits.

"2. In concluding that the taxpayer is entitled to a percentage depletion deduction on rock, sand and gravel which it removed from property that had already been dredge-mined for gold.

"3. In failing to hold that the aggregates were taken from the waste or residue of prior mining.

"4. In failing to hold that the taxpayer was the purchaser of waste or residue or of rights to extract mineral therefrom and therefore expressly prohibited from obtaining a percentage depletion allowance under Section 613 of the Internal Revenue Code 1954.

"5. In entering decision in favor of the taxpayer and failing to enter decision in favor of the Commissioner."

In reaching its decision, the Court found the salient facts indistinguishable in principle from the salient facts in

Pacific Cement & Aggregates, Inc., 31 T.C. 136 (1958).

Our examination of the facts of that case compels us to reach the same conclusion.

In essence the Commissioner contends here, as he did in Pacific Cement & Aggregates, Inc., supra, that because the properties involved had been previously dredge-mined for gold by another party whose operations picked up and then dumped back on the land the rock, sand and gravel after the free gold had been separated therefrom, the said rock, sand and gravel thereby lost their status as "natural deposits" and acquired the status of dumps or tailings, and were no longer minerals "in place" so as to qualify for a percentage depletion allowance.

The Commissioner urges that the finding of fact of the Tax Court that the aggregates taken by the taxpayer from the properties "were natural deposits that were mined by the taxpayer" is not binding upon us because the Tax Court failed to apply the proper legal standard established by prior judicial decisions and the provisions of Section 613(c) (3). In support of his argument that the aggregates in question were artificial deposits resulting from prior mining and not "other natural deposits", the Commissioner cites Atlas Milling Co. v. Jones, 115 F.2d 61 (10th Cir., 1940), cert. den. 312 U.S. 686, 61 S.Ct. 613, 85 L.Ed. 1124 (1941); Consolidated Chollar Gould & Savage Mining Co. v. Commissioner, 133 F.2d 440 (9th Cir., 1943); Hoban v. Viley, 204 F.2d 459 (9th Cir., 1953); Chicago Mines Co. v. Commissioner, 164 F.2d 785 (10th Cir., 1947), cert. den. 333 U.S. 881, 68 S.Ct. 913, 92 L.Ed. 1156 (1948); Kohinoor Coal Co. v. Commissioner, 171 F.2d 880 (3rd Cir., 1948), cert. den. 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732 (1949); Soil Builders, Inc. v. United States of America, 277 F.2d 570 (5th Cir., 1960).

The Atlas and the Consolidated cases were urged upon the Tax Court by the Commissioner in the Pacific Cement & Aggregates, Inc., case, supra. In finding them inapposite the Tax Court stated:

"In the Atlas Milling Co. case, the mineral was mined and removed to the mill where it was processed and the ore extracted. The residue was dumped and it was this residue which was acquired by the taxpayer in that case and reworked by a more modern process. The court held that such residue was not a mine and the reprocessing of it was not the working of a mine and pointed out the fact that the taxpayer there had no interest in the mine from which the ore had originally been taken. The petitioner in the Consolidated Chollar Gould case, supra, had claimed percentage depletion 'from the extraction of gold by the petitioner from certain dumps consisting of rocks and ore material which had never been milled or processed in any way but which had been deposited upon lands owned by the petitioner [from mines not located on such lands] many years prior to the acquisition of said lands by the petitioner.' In holding that the petitioner there was not entitled to depletion, the Ninth Circuit in its opinion said:

"We agree with the Board that rocks and ore material, unworked other than in the fracturing and crushing incident to its removal from a mine, dumped from mines not owned by petitioner upon land not then owned but subsequently acquired by petitioner are not within the classification of 'mines, * * * and * * * *other natural deposits.*' It is a rational interpretation of Sec. 23(m) that the word 'mines' is included in the concluding general classification of 'natural deposits.' If the dumps could be regarded as a mine, they are made by man and not by nature." (31 T.C. at 140).

We likewise find the other cases relied upon by Commissioner to be inapposite. In Hoban, the relevant facts are:

"In the year 1906, Hecla Mining Company, Federal Mining and

Smelting Company, and Hercules Mining Company owned mines and concentration mills on Canyon Creek several miles above the City of Wallace, Idaho.

"Tailings from the mills of these properties, and from the properties of other mining operations had been diverted into and had flowed down Canyon Creek for many years. Such tailings contained minerals which were not recoverable at the time. Subsequent to 1928, due to advances in the science of metallurgy, tailings deposited contained no recoverable mineral content.

"In 1907 the three companies acquired land down-stream from their respective workings upon which a dam was erected to impound tailings discharged into the creek. This dam caused tailings to be deposited on the valley floor for more than a mile above the dam. Some escaped to an area below the structure.

"Tailings deposited were indiscriminately mixed with detritus and debris carried by the stream in flood season, and varied in depth from a few inches to 25 feet." (204 F.2d pp. 459–460).

In the Chicago Mines case the question presented was "whether petitioners were entitled to the allowance of a deduction of income for depletion in connection with the processing of a low-grade ore in a dump." The dump in question resulted from mining operations on three lode mining claims which were contiguous. The dump was created by placing on the surface of the ground waste material and low grade ore resulting from the mining and shipping of high grade ore from the three mines. In the course of its opinion the Court stated at p. 787 of 164 F.2d:

"Mining thus connotes the removal of minerals from a natural deposit and does not include the reworking of mineral dumps from the surface of the earth artifically created and resulting from mining operations.

Tailings from a mine, consisting of waste material and low-grade ore placed upon the surface of land, become personal property, and the dump in a true sense does not become a mine. We adhere to what we said in the Atlas case [115 F.2d 63] that, 'The word "mines" as used in paragraph 23(m) * * * is limited to natural deposits and does not include a tailings dump deposited on the surface of land, consisting of the residue of ore that has been severed and milled'."

In the Kohinoor case the question presented was "whether the taxpayer is entitled to an allowance for percentage depletion with respect to its operations in the extraction and processing of coal from culm or refuse banks which it leased for that purpose from the owner and operator of a coal mine." It was the view of the Court "that since the taxpayer had no interest in the coal 'in place' and its interest was confined solely to the coal in the culm or refuse banks which had already been extracted from the earth, it is not entitled to a depletion allowance * * *." (171 F.2d p. 885).

In the Soil Builders case the question presented was whether the taxpayer was entitled to a percentage allowance "from the sale of colloidal phosphate" recovered from the sale of "tailings" from the earlier mining of "hardrock phosphate." In the course of its opinion the Court stated:

"That is, that no subtlety of reason or advocacy can bring the accumulations here within either the term 'mines' or the term 'natural deposits.' The colloidal phosphate not only is not in its natural location; it is not even in its natural state. In effect, it is a refined product, refined by the removal from it of all sand (silica oxide) and non-phosphate clay. The refinement process and the removal process were one and the same. By this process a deposit was undoubtedly made, but it was not a natural deposit; it was manmade." (277 F.2d p. 573.)

■ The aggregates on the properties in question are the identical aggregates which were placed in the properties by nature, the only difference being that taxpayer's predecessor in interest operated by dredge on the deposit as it existed, picking up the sand and gravel, separating the free gold therefrom and dumping the sand and gravel, minus the gold, in substantially the same place where it had picked it up. There had been no prior mining in the properties in question for the purpose of extracting aggregates and there had been no change in the size or form of the aggregates. When the gold dredging operator completed his process they were the identical aggregates which existed when the process had been commenced. In going through the dredge the aggregates were only washed. They were not treated chemically, nor were they crushed in any form. The gold was "free gold" in the sand, and the sand remained after the gold dredging operations had been completed. Taxpayer worked the identical deposit for aggregates for the first time and in the place where the sand and gravel had originally been laid down by nature. The fact that, in separating the gold, the sand and gravel had been stirred up does not warrant Commissioner's taking the position that taxpayer was not working a natural deposit in place.

■ The Tax Court found as a fact that the aggregates in question were mined by taxpayer from a natural deposit. We do not agree that the Tax Court failed to apply the proper standard. A finding is "clearly erroneous" only when "the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are unable to say that such finding is wholly erroneous.

We do not agree that the Tax Court erred in failing to hold that the aggregates in question were taken from the waste or residue of prior mining. The record is clear that only free gold was removed by the prior dredging operations on the property. This was done by separating the free gold from the sand, rock and gravel. There was no crushing or grinding of the rock, sand or gravel and it cannot be said that the gold was extracted from the aggregates. After the separation of the gold, the aggregates remained as nature created them. In no true sense can it be said that the aggregates were the residue of prior mining. The removal of the aggregates was not from a dump, refuse bank, tailings pile, or from a residue of waste materials resulting from prior mining operations. On this point the Commissioner relies on the same decisions previously cited in support of his contention that the aggregates mined by the taxpayer were not natural deposits. The facts in those cases clearly distinguish them from the instant case.

The Commissioner contends that the taxpayer was a purchaser of ores or minerals from the waste or residue of prior mining and hence prohibited from obtaining a depletion allowance. Since we have held that the finding of the Tax Court that the aggregates taken were natural deposits is not clearly erroneous, and since the aggregates were not taken from the waste or residue of prior mining, the prohibition contained in Section 613(c) (3) is not applicable.

The decision of the Tax Court is affirmed.

DUNIWAY, Circuit Judge.

I dissent.

1. The depletion allowance is applicable under section 611 of the Internal Revenue Code only if the aggregates and cobbles here involved are "natural deposits." I think that the processes that occurred during the operation of the gold dredge, which consisted essentially of picking up mixed gold, sand, gravel and cobbles from the place where nature had put them, sorting them into three components, to wit, (1) free gold, (2) sand, and (3) gravel and cobbles, keeping

out the gold, and depositing the sand in one layer and the gravel and cobbles in another on top of the sand, in a physically different location from that from which the mixed gold, sand, gravel and cobbles were removed, changed the deposit from a natural to an artificial one. I can see no real distinction between this situation and that which occurs when material is removed from an open pit mine and the residue, after extracting the gold or other desired mineral, is piled nearby, or indeed, when mineral-bearing rock is removed from an underground mine and the residue, after processing, is then piled in tailing piles. It is true that, usually, in these two cases, the extracted metal is not free metal and it is removed by crushing and chemical processes, as well as by sorting and washing, which occurred in this case. Nevertheless, I cannot see how it can be fairly said that what is left over here is a natural, and not an artificial deposit, merely because here the method of extraction of the gold was purely mechanical. Beside the fact of sorting and movement, there was a 40% increase in volume that was produced. There is another factor: there was removed from the natural deposit the most valuable thing that was a part of it, namely, the free gold. Thus, what was redeposited is not the same thing as the original deposit. In Consolidated Chollar Gould & Savage Mining Co. v. Commissioner, 9 Cir., 1943, 133 F.2d 440, we held that dumps consisting of rock and ore material which had never been milled or processed in any way were not "natural deposits." The only real difference between that case and this is that there the material had been removed from the lands of A and deposited on the lands of B. Surely, a decision as to whether a deposit is "natural" does not depend on the title to the land on which the deposit is made.

There is no dispute whatever as to the facts, that is, as to what happened. The sole question is as to the meaning of the statute as applied to those facts. This is a pure question of law, and requires no deference to the Tax Court as a fact-finder, or to its "expertise," whatever that may mean. I agree that the cases on which the government relies are factually distinguishable, except the prior Tax Court case of Pacific Cement & Aggregates, Inc., 1958, 31 T.C. 136. The Tax Court case is no more persuasive than its holding in the present case. None of the other cases stands for the proposition that these deposits are "natural deposits." In each, the deposit in question was held *not* to be a natural deposit. The cases leave us, therefore, with the statute which uses these words, and the application of that statute to what was done here.

These cases do stand for two propositions, both stated in this court's decision in Consolidated, supra, that strengthen my view that the deposits here in question are not "natural deposits." The first is that the depletion deduction is a matter of legislative grace, and the taxpayer must bring himself clearly within the statute. Here, it is by no means clear to me that the taxpayers have done so. The second is that a deposit is not a "natural deposit" if it is made by man and not by nature. That is the situation here. Man has dug up a natural deposit —one made by nature—removed and kept a valuable part of it, and deposited the rest of it, in a different form and in a slightly different location. That is a deposit made by man.

2. Section 613(c) (3) would not be applicable at all if the Tax Court's determination that the deposits here in question are "natural deposits" were correct. It applies only to the extraction by mine owners or operators of ores or minerals "from the waste or residue of prior mining." As we indicated in the Consolidated case, supra, such waste or residue, because it is a deposit made by man and not by nature, is not a natural deposit. Section 613(c) (3) gives to those who extract ores or minerals from such waste or residue of prior mining the right to a depletion deduction if they are mine owners or operators. This, however, does not aid the taxpayers here. The second sen-

tence of subparagraph (3) of the section expressly states that the subparagraph does not apply to any such extraction of the mineral or ore by a purchaser of such waste or residue or of the rights to extract ore or minerals therefrom.

I am sure that it will not be claimed that the placer mining by dredge which previously occurred on the property and which is so fully and accurately described in the majority opinion, was not "prior mining." Its purpose was to extract free gold from the soil and it was just as much mining as the digging out of coal, or clay, or gravel, or mollusk shells, or peat, or pumice, or sand, or shale, or stone, the extraction of each of which, as section 613(b) indicates, is considered mining, even though they are "free" in the same sense in which the gold obtained by placer mining is "free." How, then, can it be fairly said that the material here involved is not the waste or residue of prior mining? It is what was left over after the land was worked by a gold dredge, which is a form of mining, and after all the gold which was formerly mixed with it was removed.

Consideration of the obvious purpose of section 613(c) (3) seems to me to strengthen my view. As I understand it, it was enacted for the benefit of a mine owner or operator whose method of extracting the desired mineral at the time of the original mining left in the tailings, i. e., the waste or residue, valuable minerals, and to assure that if thereafter, using more effective means, he reworked that waste or residue, he would get his depletion allowance on the additional minerals that he recovered. It is in effect an adoption in the statute of the rule laid down by us in Commissioner of Internal Revenue v. Kennedy Mining and Milling Co., 9 Cir., 1942, 125 F.2d 399. The second sentence of section 613(c) (3) makes it clear that if miner A creates the waste or residue and then miner B comes along and buys either the waste or residue or the right to work it, miner B is not to get a depletion allowance. I think that the operators here are exactly in the position of miner B. They are purchasers of waste or residue of prior mining, or of the right to work it, and Congress did not intend them to have a depletion allowance.

I would reverse.