## HELVERING, COMMISSIONER OF INTERNAL REVENUE, v. BANKLINE OIL CO.*

No. 387. Argued February 9, 1938.—Decided March 7, 1938.

* Together with No. 388, *Bankline Oil Co.* v. *Commissioner of Internal Revenue,* also on writ of certiorari to the Circuit Court of Appeals for the Ninth Circuit.

See *Helvering* v. *Mountain Producers Corp., post,* p. 376.
90 F. 2d 899,

*Assistant Solicitor General Bell,* with whom *Solicitor General Reed, Assistant Attorney General Morris,* and *Messrs. Sewall Key, A. F. Prescott,* and *Warner W. Gardner* were on the briefs, for the Commissioner.

*Mr. Martin J. Weil,* with whom *Mr. A. L. Weil* was on the briefs, for the Bankline Oil Company.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

*No. 387.*—This case presents the question whether respondent, the Bankline Oil Company, is entitled to an allowance for depletion with respect to gas produced from certain oil and gas wells. The ruling of the Board of Tax Appeals that the taxpayer had no depletable interest (33 B. T. A. 910) was reversed by the Circuit Court of Appeals. 90 F. (2d) 899. Because of an asserted conflict with the principles applicable under the decisions of this Court, we granted certiorari.

Respondent in the years 1927 to 1930 operated a casinghead gasoline plant in the Signal Hill Oil Field, Los Angeles County, California. Respondent had entered into contracts with oil producers for the treatment of wet gas by the extraction of gasoline. The Board of Tax Appeals made the following findings:

Natural gas, commonly known as "wet gas" as it flows from the earth, is not a salable commodity. It is only through processing—by separation of the gasoline therefrom—rendering it dry, that it may be sold for commercial uses. Conversely, it is only through the separation of dry gas from wet gas that the gasoline is salable. It is this process that produces casinghead gasoline. The content of gasoline in wet gas varies from one-half gallon to six gallons a thousand cubic feet of gas produced, depending upon its richness. Respondent's contracts provided, generally, that it should install and maintain the necessary pipe lines and connections from casingheads or traps at the mouth of the well to its plant, through which the producer agreed to deliver the natural gas produced at the well, and that respondent should extract the gasoline therefrom, respondent to pay the producer 33⅓ per cent. of the total gross proceeds derived from the sale of gasoline extracted from wet gas, or, at producer's option, to deliver to the producer 33⅓ per cent. of the salable gasoline so extracted. A slightly different type of contract provided for the outright "purchase" from the producer of all natural gas produced at a given well, the respondent paying 33⅓ per cent. of the gross proceeds received by it from the sale of the gasoline extracted from such gas. Some of the dry gas remaining after removal of the gasoline was blown to the air and wasted because there was no market for it, while some was sold to public utilities, and in that case respondent accounted to the producer for a proportion of the proceeds provided for under the contract, and some was returned to the wells to be used for pressure purposes.

The Government maintains that under the contracts respondent took no part in the production of the wet gas, conducted no drilling operations upon any of the producing premises, did not pump oil or gas from the wells, and

had no interest as lessor or lessee, or as sub-lessor or sub-lessee, in any of the producing wells.

Respondent states that in accordance with the provisions of the contracts it attached pipe lines to the various wells, carried the gas from those wells to its plant, where the gas from the wells of the different producers was commingled, and removed the gasoline therefrom. The gasoline was sold and respondent accounted to each producer "for one-third of the proceeds of the producer's *pro rata* of the gasoline made." Respondent contends that it was entitled to deduct for depletion 27½ per cent. of the difference between the price which it paid for the wet gas and its fair market value at the mouths of the wells. Respondent took the "prevailing royalty," which it deemed to be established by the evidence, as that market value, and treated the difference between the amount respondent paid and the greater prevailing royalty as respondent's gross income for the purpose of applying the statute. Revenue Acts of 1926, § 204 (c) (2), § 234 (a) (8); 1928, § 23 (l) (m), § 114 (b) (3).

The Circuit Court of Appeals was of the opinion that respondent had acquired an economic interest in the wet gas in place and was entitled to an allowance for depletion. But as no finding had been made of the market value of the wet gas, or of respondent's net income from the property, the court remanded the case to the Board of Tax Appeals to the end that respondent might supplement its proof and that an allowance for depletion should be made in accordance with the evidence produced.

In order to determine whether respondent is entitled to depletion with respect to the production in question, we must recur to the fundamental purpose of the statutory allowance. The deduction is permitted as an act of grace. It is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production.

*United States* v. *Ludey,* 274 U. S. 295, 302. The granting of an arbitrary deduction, in the case of oil and gas wells, of a percentage of gross income was in the interest of convenience and in no way altered the fundamental theory of the allowance. *United States* v. *Dakota-Montana Oil Co.,* 288 U. S. 459, 467. The percentage is "of the gross income from the property,"—a phrase which "points only to the gross income from oil and gas." *Helvering* v. *Twin Bell Syndicate,* 293 U. S. 312, 321. The allowance is to the recipients of this gross income by reason of their capital investment in the oil or gas in place. *Palmer* v. *Bender,* 287 U. S. 551, 557.

It is true that the right to the depletion allowance does not depend upon any "particular form of legal interest in the mineral content of the land." We have said, with reference to oil wells, that it is enough if one "has an economic interest in the oil, in place, which is depleted by production"; that "the language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." *Palmer* v. *Bender, supra.* But the phrase "economic interest" is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit. See *Thomas* v. *Perkins,* 301 U. S. 655, 661.

It is plain that, apart from its contracts with producers, respondent had no interest in the producing wells or in the wet gas in place. Respondent is a processor. It was not engaged in production. Under its contracts with producers, respondent was entitled to a delivery of the gas produced at the wells, and to extract gasoline therefrom, and was bound to pay to the producers the stipulated amounts. Some of the contracts, reciting that the

producer was the owner of the gas produced, provided for its treatment by respondent. Other contracts were couched in terms of purchase. In either case the gas was to be delivered to respondent at the casingheads or gas traps installed by the producer. Respondent had the right to have the gas delivered, but did not produce it and could not compel its production. The pipe lines and equipment, which respondent provided, facilitated the delivery of the gas produced but the agreement for their installation granted no interest in the gas in place. Nor was such an interest created by the provision for payment for the gas delivered, whether the payment was made in money out of the proceeds of the gasoline extracted or by delivery of the agreed portion of the gasoline. Whether or not the wet gas had a market value and, if it had, whether that value was greater than the amount respondent paid, is in no sense determinative. Respondent was still a processor, paying for what it received at the well's mouth. As the Board of Tax Appeals said: "It is safe to say, we believe, that this petitioner [respondent] had no enforceable rights whatsoever under its contracts prior to the time the wet gas was actually placed in its pipe line, i. e., after it had passed beyond the casingheads and gas traps supplied by the producer into the pipe line, except the right, perhaps, to demand that the producer deliver whatever was produced through its pipe lines for treatment during the period of contractual relationship."

Undoubtedly, respondent through its contracts obtained an economic advantage from the production of the gas, but that is not sufficient. The controlling fact is that respondent had no interest in the gas in place. Respondent had no capital investment in the mineral deposit which suffered depletion and is not entitled to the statutory allowance.

The judgment of the Circuit Court of Appeals in this relation is *reversed* and the decision of the Board of Tax Appeals is affirmed.

*No. 388.*—In 1929, the State of California leased to J. H. Barneson oil and gas lands in Santa Barbara County, reserving a royalty. We assume, for the purposes of this case, as it was assumed below, that the lease was of tidelands owned by the State. Barneson acted on behalf of petitioner, the Bankline Oil Company, in obtaining the lease, which was duly assigned to petitioner and approved by the State. Claiming that the income received from operations under the lease was exempt from the federal income tax, upon the ground that such a tax would constitute an unconstitutional burden upon a state instrumentality, petitioner sought to recover the tax paid for the year 1930. The Circuit Court of Appeals, affirming the decision of the Board of Tax Appeals (33 B. T. A. 910), overruled petitioner's contention. 90 F. (2d) 899. In view of the importance of the question, certiorari was granted.

We are of opinion that the decision of the Circuit Court of Appeals was right. As petitioner was engaged in its own business in producing the oil, it was bound to pay a federal income tax upon its profits even though its operations were conducted on state lands. We are unable to find any substantial distinction between the instant case and that of *Burnet* v. *Jergins Trust,* 288 U. S. 508, where the city of Long Beach, California, made an oil and gas lease to a private party covering part of a tract owned by the city, the proceeds of the oil and gas sales being divided between the city and the lessee. The claim of immunity by the lessee as an instrumentality of the State, acting through the city, was held to be untenable.

So far as the case of *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, which was distinguished in *Burnet* v. *Jergins Trust, supra,* may be regarded as supporting a dif-

ferent view, it is disapproved. See *Helvering* v. *Mountain Producers Corp., post*, p. 376.

The judgment of the Circuit Court of Appeals with respect to petitioner's income from the lease is affirmed.

*Judgment in No. 387 reversed; in No. 388 affirmed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER concur in the result.

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration and decision of this case.

