**GRAY et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 13120.

United States Court of Appeals, Fifth Circuit.

July 14, 1950.

Rehearing Denied Aug. 21, 1950.

Thad T. Hutcheson, Houston, Tex., for petitioner.

Sumner M. Redstone, Ellis N. Slack and Helen Goodner, Sp. Assts. to Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen. and Charles Oliphant, Chief Counsel, Bureau of Internal Revenue, Bernard D. Daniels, Special Attorney, Washington, D. C., for respondent.

Before McCORD, BORAH and RUSSELL, Circuit Judges.

McCORD, Circuit Judge.

This appeal involves income taxes for the years 1943 and 1944 as to William D. Gray and his wife, Fannie M. Gray, and for the fiscal years ending July 31, 1942, and July 31, 1944, as to R. J. Wolfe and wife, Nona Hobbs Wolfe. The four cases presented have been consolidated in the Tax Court, and will be considered jointly on this appeal. 13 T.C. 265.

The ultimate question presented for our consideration is whether the Tax Court correctly held that taxpayers reserved an economic interest in certain oil and gas leases which they assigned, so that the assignments constituted subleases rendering the amounts received thereunder taxable as ordinary income, or whether such assignments actually were sales of the leases involving no taxable gain.

The material facts, briefly stated, reveal that William D. Gray and R. J. Wolfe were equal co-partners in a firm known as Gray & Wolfe, with office and principal place of business in Houston, Texas. The partnership was engaged in drilling operations and oil and gas production. It kept books and filed returns on the accrual basis of accounting.

In the fall of 1941 and the spring of 1942, and within the fiscal year ending July 31, 1942, Gray & Wolfe acquired certain oil and gas leases covering approximately 1,800 acres of land located in the Pinehurst field, in Montgomery County, Texas. The leases were acquired at a cost of $45,000.00, plus a drilling obligation incurred under certain of the lease contracts.

On May 25, 1942, Gray & Wolfe entered into certain written contracts with the La Gloria Corporation, under which the oil and gas rights in the above leases were assigned. Two assignment contracts were executed, the first covering the oil and gas rights on 1,640 acres of the lands leased, and the second agreement covering an assignment of the remaining 156.6

acres.[1] These agreements specifically excepted and reserved to the partnership, Gray & Wolfe, certain interests in both the oil and gas rights conveyed. In substance, they provided for an overriding royalty of one-fifth of all oil produced from the leased lands, with a limitation that this royalty would be reduced to one-tenth when the oil no longer flowed naturally unless Gray & Wolfe contributed a *pro rata* share of the cost of recovering the oil by mechanical means. With reference to the gas rights, the assignment contracts expressly provided that after the La Gloria Corporation had recovered any operating costs incurred in developing the leases, the amounts received from the sale of gas and its by-products would be divided between Gray & Wolfe and the La Gloria Corporation, the former retaining a one-fifth interest and La Gloria Corporation a four-fifths interest therein.[2] The assignment contracts thus reserved to Gray & Wolfe a twenty per cent interest in the net profits to be derived from the sale of gas and gasoline products.

The supplemental agreement, or Gas Pro-

duction Contract, contained a provision that, in the event the La Gloria Corporation elected to construct a gas processing and cycling plant, twenty per cent of the stock and interest in such plant would be reserved for and conveyed to Gray and Wolfe.[3] In general, the contracts further required the La Gloria Corporation to furnish Gray & Wolfe with monthly statements as to the development and operating costs, the amounts of oil and gas recovered, the disposition of the gas and its products, and a statement as to how the proceeds were distributed. They also contained certain provisions for arbitration of any controversies or disputes which might arise between the parties.

The partnership returns of Gray & Wolfe for the fiscal years ending July 31, 1942, and July 31, 1943, as well as the individual returns of the taxpayers and their wives during the same period, did not show as income any portion of the amounts received from the La Gloria Corporation in 1942 and 1943, as consideration for the assignment of the oil and gas leases. The Commissioner accordingly increased the

1. In addition, the parties then executed a supplemental agreement called a Gas Production Contract, as well as a drilling contract under which Gray & Wolfe obligated itself to drill a well on one of the leases for the La Gloria Corporation.

2. As for the oil and gas rights reserved, the agreements provided:
"It is expressly understood and agreed that there is excepted from this transfer and conveyance and that there is reserved to Sellers, their heirs and assigns, the following: (1) On oil, an overriding royalty of 1/5 of all oil produced and saved from the leasehold estates herein conveyed. In the event any oil well ceases to flow naturally, thereby necessitating the use of mechanical means to produce oil from such well, the said overriding royalty provided for herein shall be reduced to 1/10 of all oil produced from any such well or wells unless Sellers contribute their *pro rata* share of the lifting cost incurred in producing oil therefrom by mechanical means. (2) Purchaser will retain all proceeds derived from the sale of gas, casinghead gas, residue gas, as well as all natural gasoline, condensate and all other products extracted or separated from gas that is

produced from said leasehold interests until such time as Purchaser shall have recovered a sum of money equal to the total of its Development and Operating costs. * * * From and after the time when Purchaser shall have recovered its said Development and Operating costs from funds derived from the sale of gas * * * the balance of all funds so derived from said sources shall be divided between purchaser and Sellers on the basis of 4/5 to Purchaser and 1/5 to Sellers * * * "

3. In this connection, the Gas Production Contract provides:
" * * * Purchaser hereby binds and obligates itself to properly assign and transfer to Sellers twenty per cent of the stock in any corporation it may form or cause to be formed for the purpose of erecting, owning and operating a gas processing and cycling plant through which the gas produced from the unitized leases above mentioned shall be processed, it being understood that said stock is to be so assigned to Sellers free of cost to them at the time such corporation is organized, if in fact it is organized. * * * "

partnership income for the fiscal year 1942 by $45,000.00, and for 1943 by $6,971.95, which amounts represent the actual cash received from La Gloria Corporation by Gray & Wolfe during the tax years involved. Statutory notices of deficiency were thereafter issued against each of the individual taxpayers wherein the additional income was assessed against them, although allowance was made for the statutory rate of depletion on their asserted interest in the oil and gas leases.[4] The Tax Court thereafter upheld the Commissioner's determination. 13 T.C. 265.

 We are of opinion the Tax Court correctly held that the assignments of the oil and gas leases here involved must be construed as sub-leases and not sales, and that the amounts received therefrom are taxable as ordinary income. Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 328 U.S. 25, 66 S.Ct. 861, 90 L. Ed. 1062, 162 A.L.R. 827; Kirby Petroleum Co. v. Commissioner Internal Revenue, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Burnet v. Harmel, 287 U. S. 103, 53 S.Ct. 74, 77 L.Ed. 199. In such cases, the acid test of whether an assignment of a mineral lease is an outright sale, or actually only a sub-lease, depends upon whether the assignor has completely divested himself of any interest in the minerals to be recovered or has instead reserved an "economic interest" in the mineral estate. Here, it becomes patent that the retention under the assignment contracts of an overriding royalty in the oil and a twenty per cent interest in the net profits from the sale of gas and gas products, along with a contingent interest in any processing plant constructed, manifestly resulted in the reservation of an "economic interest" in the oil and gas in place. Burton-Sutton Oil Co. v. Commissioner Internal Revenue, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062,

162 A.L.R. 827; Kirby Petroleum Co. v. Commissioner Internal Revenue, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Cf. Commissioner Internal Revenue v. J. S. Abercrombie Co., 5 Cir., 162 F.2d 338.

We consider the authorities cited and relied upon by taxpayers as readily distinguishable under their own facts, and in no wise applicable or controlling here. Cf. Helvering v. O'Donnell, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903; Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904; Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897; Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277.

The judgment is

Affirmed.

---

4. In his deficiency letter, the Commissioner indicated the reasons for his ruling:

"It is held that the transactions whereby the partnership Gray & Wolfe assigned certain oil and gas leases to La Gloria Corporation and retained certain interests therein were in the nature of subleasing transactions and the cash amounts received by the partnership in consideration of the assignments are ordinary income of the partnership subject to depletion allowances of $27\frac{1}{2}\%$ thereof which have been allowed herein."