**BANKLINE OIL COMPANY, Petitioner,**
**v.**
**COMMISSIONER OF INTERNAL REVENUE, Respondent.**
**No. 16201.**

United States Court of Appeals
Ninth Circuit.

Feb. 2, 1960.

Melvin D. Wilson, Melvin H. Wilson, Los Angeles, Cal., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Myron C. Baum, Lee A. Jackson, Attys., Department of Justice, Washington, D. C., for respondent.

Before CHAMBERS, BARNES and HAMLEY, Circuit Judges.

CHAMBERS, Circuit Judge.

Wet gas, sometimes called casing head gas, from oil wells in the Signal Hill area of Long Beach, California, is at the root of Bankline's income tax problems on review here for the year 1952. (The problems arise out of an agreement it made with the Signal Oil Company in that year.) When processed, this wet gas produces three products: natural gasoline, propane and dry gas. In the particular gas with which Bankline dealt, in terms of value, more than 80 per cent was in the natural gasoline produced and the remainder was in the dry gas and propane.

So far as the facts here are concerned, Bankline was not the original producer. Prior to January 1, 1953, Bankline had entered into eight processing agreements with various well owners. The agreed royalty to the producer was 50 per cent of the natural gasoline and propane. Bankline was entitled to use such of the dry gas as it needed for fuel in the processing, and the proceeds of any dry gas remaining were to be divided equally between Bankline and the producer. The producers had options to be paid their royalty on the natural gasoline and propane in money or in kind.

Four of the contracts were construed by the Supreme Court in Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897, as giving Bankline no interest in the gas in place and, therefore, no depletion. While that fact still remains true, we do not regard the depletion case as determining this one.

By 1952, apparently the volume of wet gas available to Bankline under its contracts had declined to a point where its former profitable operation was in danger. (Perhaps there were other economic factors, too.) The Signal Oil and Gas Company was already in the field doing similar processing. Apparently it could absorb Bankline's operation without much additional capital expenditure or much additional operational cost.

By separate simultaneous agreements, Bankline went out of the business of processing natural gas at Signal Hill, and Signal Oil took over. The agreements were signed by Bankline on November 1, 1952. Under the first agreement, Bankline sold to Signal Oil its plant and pipelines and an unrelated lease. (No tax aspects are here involved from the first agreement.) The second agreement concerned the processing operation whereby Signal Oil undertook to do the processing. This agreement, in letter form, is the pivot upon which the case swings. Therefore, we set it forth as an appendix to the opinion.

It is fair to say that the agreement was not a flat assignment of Bankline's rights [1] and Signal Oil did not assume Bankline's financial obligations to the producers under its eight agreements with the producers, except of course Signal Oil undertook Bankline's processing obligation and that of delivery in kind of products when so requested by the oil

---

1. There was a separate instrument assigning to Signal Oil the eight basic contracts.

producers. An initial consideration from Signal Oil to Bankline of $85,000 was specified. This was represented by an installment promissory note which was eventually paid according to its terms.

Under the arrangement Signal was to receive (or retain) 2½ cents per gallon on all natural gasoline and 1¼ cents per gallon on all propane. This was to be varied in accordance with changes in the market for gasoline. Dry gas left over beneficially was wholly for Bankline or the producer.

In 1952, Bankline received the $85,000 installment note from Signal Oil and in the two months of operation that year Bankline had a profit of $11,351.41 attributable to its basic eight contracts with producers.[2] (Signal Oil remitted to petitioner the sum of $23,805.50 and royalties required Bankline to pay producers $12,454.09; $11,351.41 is the difference.) The taxpayer reported $11,351.41 as ordinary income and claimed a capital gain on the $85,000. Later it claimed the smaller amount was entitled also to capital gains treatment. The commissioner and the tax court ruled against Bankline on both points. We affirm.

On review here, Bankline virtually abandons its contentions that its annual profit based on the difference between what it gets from Signal Oil and what is paid to the producers is a capital gain. But it strongly contends there was a partial transfer of a capital asset,[3] 30 per cent of the gasoline produced or thereabouts, to Signal Oil and that the $85,000 was payment therefor. The government insists this is a new point which we should not consider. We do not think we should be too strict on this point. Broadly, we think the contention that all

of the payments were for capital assets includes the parts thereof. And really, pro and con, most of the arguments of both parties apply to this one part of $85,000 as well as the whole.

We think as a matter of law it might be said that the annual profits were not income from the sale of a capital asset, but income from the interest in the product which Bankline clearly retained. And as to the $85,000 payment, it was not less than a question of fact as to whether a partial assignment was made or whether Signal Oil was just a subcontractor of Bankline.[4] The tax court was entitled to consider the way Bankline carried the transaction on its books, which was inconsistent with a sale. It was entitled to disregard the plausible reasons offered by the accountant for the manner in which Bankline kept its books.

While not conclusive, a fact entitled to be considered by the tax court was that the lease and assignments to Signal Oil did not necessarily transfer (only ten years certain) all that Bankline had in its leases from its lessors, although the new arrangement may have covered the expected life of the wells. The tax court could consider that the base price of 2½ cents per gallon (which took about 30 per cent of the total value) for processing was higher than the normal processing charge in the industry[5] and could have been the inducement to pay a fee for the privilege of charging 2½ cents per gallon.[6] The amount of business activity which Bankline still handled on its eight contracts, of not much weight by itself, could be considered.

The tax court was entitled to find that Signal Oil sold or delivered to the trade

---

2. The profit obtained by Bankline in 1953 was $94,489.74; in 1954, $91,002.85; and in 1955, $90,465.43. These years are not in litigation here.

3. Bankline's case arises under Section 117 of the 1939 Internal Revenue Code, as amended, 26 U.S.C.A. § 117.

4. The recasting, this time against the taxpayer, is what this court approved in Robinson v. Elliott, 9 Cir., 262 F.2d 383.

5. The normal price for processing gas in 1952 in the area varied from 75/100ths to 85/100ths of a cent per gallon of gas produced.

6. From 1952 to 1955 Signal Oil's share of sales was as follows:

| 1952 | $10,235.87 |
|------|------------|
| 1953 | 79,196.89 |
| 1954 | 75,026.84 |
| 1955 | 74,772.56 |

the three products of processing for the account of Bankline. With that finding, its ultimate conclusion was almost inevitable.

The taxpayer cites many cases of split assignments and licenses where capital gains treatment has been permitted. We do not hold that Bankline could not have made a transfer of a capital asset to Signal Oil, but we do hold that at least there was a question of fact resolved against Bankline which we cannot overturn.[7] Had the tax court ruled in favor of Bankline, perhaps we could uphold it. That is not before us. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

The decision is affirmed.

## APPENDIX

### Exhibit 3

Signal Oil and Gas Company
General Offices, 811 West Seventh Street
Los Angeles 17, California

October 29, 1952.

Bankline Oil Company,
437 South Hill Street,
Los Angeles, California.

Gentlemen:

Subject to the conditions and for the considerations hereafter set forth, Signal Oil and Gas Company hereby offers to purchase from you the following properties, to wit:

All leases, gas contracts or other purchase agreements held by Bankline for the purchase or processing of wet gas from properties located in the Signal Hill Oil Field. A schedule of said instruments is hereunto attached and by this reference made a part hereof and marked Exhibit "A".

Signal Oil and Gas Company offers to pay for the above-described properties the sum of $85,000.00, plus further sums of money calculated in the following manner:

Signal shall process said wet gas, or cause said wet gas to be processed, at its plant in the Signal Hill Oil Field or at such other plant or plants as Signal shall hereafter elect, whether or not said plants shall be owned and/or operated by Signal. All dry gas resulting from said operations not required to be returned to the properties from which produced shall be sold by Signal and the net sales price paid to Bankline monthly. All natural gasoline and LPG Propane extracted by Signal from said wet gas shall likewise be sold by Signal at the average price it receives for like products sold by Signal, and Signal shall pay to Bankline monthly a sum of money equal to the sales price of said natural gasoline and LPG Propane, less the following sums, to wit:

The sum of 2½c per gallon on all natural gasoline and the sum of 1¼c per gallon on all LPG Propane.

Said deductions are based upon the present price of 8.33c per gallon posted by Standard Oil Company of California for 21# R.V.P. natural gasoline in the Signal Hill Oil Field and shall be increased or decreased at the times and in direct proportion to any increase or decrease above or below said price of 8.33c per gallon posted by Standard Oil Company of California for 21# R.V.P. natural gasoline in the Signal Hill Oil Field.

Connections shall be established between the wet gas lines presently owned and operated by Bankline and those presently owned and operated by Signal at two locations, to wit: in the proximity of Temple and Hill Streets and in the proximity of Willow and Walnut Streets, Signal Hill, and transmission of said gas shall be made at said points or at other points if in Signal's judgment other connections shall be required. Signal shall also connect its dry gas lines to the dry gas lines presently owned and operated by Bankline in the proximity of Cherry and Willow Streets for delivery of gas to the properties from which it is produced, when such redelivery shall be required. Signal shall meter the wet gas in master meters installed for said pur-

7. Cf. Starr's Estate v. Commissioner, 9 Cir., 274 F.2d 294.

pose and shall make all applicable tests at said points, accounting to Bankline for the entire amount of wet gas received pursuant to this agreement without allocation as to the individual properties from which said gas is produced.

Signal in its operations hereunder shall use the same metering, testing, and accounting procedure currently used by Signal in connection with other wet gas being purchased by Signal in said Signal Hill field and drips secured from the pipe-line system of Bankline will be accounted for on the same basis as other drips collected by Signal; provided, however, that such procedures of metering, testing and accounting shall conform with the provisions of the agreements described in Exhibit "A" as modified from time to time by usages and customs in the industry.

This agreement shall remain in full force and effect for the period of ten years from November 1, 1952, and thereafter so long as Signal shall elect. In the event that at any time after ten years from November 1, 1952, Signal shall desire not to receive and/or process the wet gas produced from the properties described in Exhibit "A" it shall give written notice to that effect to Bankline. Within thirty days after said notice Bankline by written notice to Signal may elect to purchase the leases, gas contracts and other purchase agreements herein purchased from Bankline for the sum of $10.00 and have such of said leases and other agreements then remaining in effect reassigned to it, and upon notice to that effect Signal shall reassign all of said leases and agreements. In the event Bankline shall not elect to receive such reassignments, then Signal may without further obligation to Bankline sell or assign said agreements to third parties or may quitclaim, surrender or otherwise terminate any or all of them.

If the foregoing is acceptable to you, will you please so indicate by signing and returning the carbon copy of this letter.

Yours very truly,
SIGNAL OIL AND GAS
COMPANY,
By /s/ R. H. GREEN,
Vice President.

Accepted this 1st day of November, 1952.
Bankline Oil Company,
By /s/ L. L. Aubert.

### Exhibit "A"

(a) Contract for the treatment of wet gas, dated June 15, 1936, by and between Bankline Oil Company and Jet Oil Company.

(b) Contract for the treatment of wet gas, dated December 1, 1950, by and between Bankline Oil Company and M. K. Doumani.

(c) Contract for the treatment of wet gas, dated December 6, 1932, by and between Bankline Oil Company and D. D. Dunlap.

(d) Contract for the treatment of wet gas, dated June 9, 1922, amended May 17, 1927, by and between Bankline Oil Company and General Petroleum Corporation.

(e) Contract for the treatment of wet gas, dated October 1, 1938, by and between Bankline Oil Company and Incorporated Production Co.

(f) Contract for the treatment of wet gas, dated January 1, 1952, by and between Bankline Oil Company and Progressive Oil Company.

(g) Contract for the treatment of wet gas, dated March 15, 1934, by and between Bankline Oil Company and William C. McDuffie, as Receiver of Richfield Oil Company of California.

(h) Contract for the treatment of wet gas, dated May 25, 1925, by and between Bankline Oil Company and The Superior Oil Company.