# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 3, 2022

Lyle W. Cayce
Clerk

No. 21-10373

Exxon Mobil Corporation,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

United States of America,

*Defendant—Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CV-2921

Before Clement, Graves, and Costa, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:

In this tax doubleheader, Exxon seeks $1.5 billion from the IRS. The source of this whopping sum is two retroactive changes Exxon made to its returns. The first change involves a tax issue almost as old as the oil industry itself: whether a transaction is a mineral lease or mineral sale. *See, e.g.*, *Goldfield Consol. Mines Co. v. Scott*, 247 U.S. 126 (1918); *Stratton's Indep., Ltd. v. Howbert*, 231 U.S. 399 (1913). The second concerns a more recent development in the tax code: how an incentive for producing renewable fuels affects a company's excise tax, and in turn, its income tax. The district court

No. 21-10373

rejected both changes but gave Exxon back a penalty the IRS imposed for requesting an excessive refund. We affirm.

I

The first issue—worth a billion dollars—involves agreements Exxon entered into with Qatar and Malaysia to commodify those countries' abundant offshore oil-and-gas deposits. The question is whether these agreements are mineral leases or mineral sales.

A

1

The Qatari agreements grant Exxon rights to explore the North Field, a large offshore gas field within Qatar's territorial waters. The agreements last for fixed terms, typically twenty years. In exchange for mineral rights, Exxon must extract gas and pay Qatar royalties based on the petroleum products it produces. These royalties include a percentage of the proceeds from the sale of petroleum products as well as a minimum amount based on how much gas Exxon brings through its facilities.

Exxon also must build and operate facilities to transport, store, process, and market its products. According to Exxon, it has invested $20 billion in such infrastructure, which includes a pipeline network to bring the offshore gas onshore, liquification facilities to turn the gas into liquid products for transportation, and technologically advanced ships that transport gas to foreign countries. By some measures, this infrastructure produces petroleum products that are twenty times as valuable as gas in place. When the agreements end, Qatar keeps this infrastructure. The agreements aim to develop an international market for Qatari gas.

No. 21-10373

Malaysia sought to create a domestic market for oil and gas. So its state-owned oil company[1] entered into similar fixed-term agreements with Exxon. The Malaysian agreements give Exxon rights to extract offshore minerals in the Malay Basin. In exchange, Malaysia is entitled to in-kind royalties—that is, set percentages of the oil extracted from the Malay Basin—and additional payments that turn on how much oil is produced. In addition, Exxon must make annual "abandonment cess" payments that do not depend on mineral production. These payments fund the costs of plugging wells at the end of their useful lives. As in Qatar, Exxon has developed considerable extraction, transportation, storage, and processing infrastructure in Malaysia, which reverts to the state after the contracts expire.

2

Transfers of mineral interests are typically categorized as leases or sales. In a mineral lease, the transferor provides minerals in place and grants the transferee the right to explore those minerals in exchange for a share of the income from mineral production. *See* 5 Mertens Law of Federal Income Taxation § 24:21 (2022). An example would be allowing someone to drill for oil on one's land in exchange for a 1/4 interest in the oil produced. *See Murphy Oil Co. v. Burnet*, 287 U.S. 299, 300 (1932). In a mineral sale, the transferor "makes an outright transfer" of mineral interests for fixed consideration that does not depend on mineral production. 5 Mertens, *supra*, at § 24:16. An example would be selling a fixed amount of minerals under one's land for $200,000. *See Whitehead v. United States*, 555 F.2d 1290, 1292 (5th Cir. 1977).

---

[1] That company is Petronas. This opinion refers to Petronas as Malaysia.

No. 21-10373

Mineral leases and mineral sales receive different income-tax treatment. With mineral leases, the transferor's income from minerals is treated as ordinary taxable income. 5 MERTENS, *supra*, at § 24:66. That is, a portion of the overall income from minerals is included only in the transferor's taxable income and excluded from the transferee's taxable income. *Id.* The transferor and transferee are each entitled to depletion deductions to the extent of their interest in the minerals. *See* 26 C.F.R. § 1.611-1.

For mineral sales, the transferor realizes income only at the time of the sale. 5 MERTENS, *supra*, at § 24:19. Income derived from the extraction of minerals is included in the transferee's taxable income, and only the transferee is entitled to depletion deductions. *Id.* Income that the transferor receives from the transaction—the sales price—is taxed as capital gains. *Id.*

3

When it filed its tax returns for years 2006 to 2009, Exxon treated its mineral transactions with Qatar and Malaysia as leases. Exxon, as the transferee, thus did not include in its taxable income the portion of mineral-based income that it paid to Qatar and Malaysia as royalties.

A few years later, Exxon amended its returns and filed a refund claim. In the amended returns, Exxon instead treated the mineral transactions as sales. Exxon's taxable income increased because it now included all the income derived from minerals, including the royalties paid to Qatar and Malaysia. The income that would have been taxable to Qatar and Malaysia in the mineral-lease context was now taxable to Exxon. In turn, Exxon offset a portion of the increase in its taxable income by deducting some of the royalty payments it made to Qatar and Malaysia.

Despite the *increase* in its taxable income, Exxon nevertheless requested a massive refund of $1 billion. How so? Exxon's new math had

the downstream effect of clearing the way for it to claim foreign-tax credits. Because Exxon had paid foreign tax on the money that it now included in its U.S. taxable income, Exxon was able to claim credit intended to prevent the double taxation of income. The foreign-tax credits generated its mammoth refund request.

The IRS rejected Exxon's refund claim. It also imposed a $200 million penalty for Exxon's claiming an excessive refund without a reasonable basis. Exxon paid the penalty and filed a refund action in district court.

After a bench trial, the district court ruled in the government's favor on the lease-versus-sale issue. On the penalty issue, however, the court held for Exxon and ordered a refund. Exxon appealed the lease-versus-sale issue, and the government cross-appealed the rejection of the penalty.

B

The lease-or-sale classification turns on the concept of "economic interest."[2] If Qatar and Malaysia retain an economic interest in the mineral deposits that Exxon extracts, the agreements are leases; if not, the agreements are sales. *Whitehead*, 555 F.2d at 1292; *see also* 5 MERTENS, *supra*, at § 24:16.[3]

---

[2] The district court looked to the "predominant or primary purpose" of the agreements to conclude that they are leases. We agree with Exxon and the government that our cases do not support that "predominant purpose" analysis. The correct benchmark is the economic-interest test.

[3] The economic-interest test became a feature of oil-and-gas law after enactment of the Tariff Act of 1913. Pub. L. No. 63-16, § 2, 38 Stat. 114, 172. That law recognized the exhaustible nature of mineral deposits and introduced a "reasonable allowance for depletion" of such assets in calculating taxable income. *Id.* at 172; *see* Joseph T. Sneed, *The Economic Interest—An Expanding Concept*, 35 TEXAS L. REV. 307, 309 (1957). Courts

No. 21-10373

An "economic interest" is a right to share in the profits and losses of a business.  One example is owning stock.  The stock goes up when the company succeeds and down when it struggles.  Similarly, it seems apparent that a party entitled to a percentage of the profits from any oil extracted has an economic interest in the oil.  The more oil that is drilled, the more money the royalty holder makes.  *See Anderson v. Helvering*, 310 U.S. 404, 409 (1940) ("The holder of a royalty interest . . . is deemed to have 'an economic interest' . . . .").

The law crystallizes this lay understanding.  To have an economic interest in minerals in place, a person must have (1) an investment in the minerals and (2) income derived solely from extraction of the minerals.  26 C.F.R. § 1.611-1(b)(1) (adopting the two-part test from *Palmer v. Bender*, 287 U.S. 551, 557 (1933)).

Qatar and Malaysia have an economic interest.  In exchange for giving Exxon valuable rights to drill in the North Field and Malay Basin, Qatar and

---

were soon confronted with the question of which party was entitled to lucrative depletion deductions in multiparty transactions.  Thus emerged the economic-interest test— taxpayers involved in complex oil-and-gas contracts could only claim a depletion deduction to the extent of their "economic interest" in the minerals in place.  *See* J. Paul Jackson, *Federal Income Tax Problems Involved in Typical Oil and Gas Transactions in Texas*, 25 Texas L. Rev. 343, 344 n.4 (1947).

The typical economic-interest case thus involves taxpayers' claiming an economic interest in a mineral deposit because they want a depletion deduction that will reduce their income tax.  *See, e.g.*, *Comm'r v. Sw. Expl. Co.*, 350 U.S. 308, 313 (1956).  And as alluded to above, in some cases taxpayers disclaim an economic interest because doing so means that their income from a transaction is taxed favorably as capital gains rather than ordinary income.  *See, e.g.*, *Wood v. United States*, 377 F.2d 300, 301 (5th Cir. 1967); 5 Mertens, *supra*, at § 24:15.

This case distorts those ordinary postures.  Here, the focus is not on the taxpayer's (meaning Exxon's) economic interest, but on that of the counterparty.  And Exxon's ultimate goal is not depletion deductions or capital-gains treatment, but downstream foreign-tax credit.

No. 21-10373

Malaysia "retain[] a right to share in the [minerals] produced." *Palmer*, 287 U.S. at 557. Qatar receives a percentage of the proceeds from the sale of petroleum products and an additional amount that depends on how much gas Exxon delivers to its Qatari facilities. Malaysia is entitled to a set percentage of oil extracted from the Malay Basin, plus additional payments that turn on how much oil and gas is produced.

These uncapped royalties, which last for the entire duration of the agreements, are similar to royalties that case after case deems an economic interest. *See Palmer*, 287 U.S. at 553–59 (holding that a royalty of one-eighth of oil produced was sufficient for an economic interest); *Rutledge v. United States*, 428 F.2d 347, 350 (5th Cir. 1970) (holding that royalty payments pegged to the amount of material extracted constituted an economic interest); *Wood*, 377 F.2d at 307 (holding that a minimum guaranteed royalty payment created an economic interest); *Gray v. Comm'r*, 183 F.2d 329, 330–31 (5th Cir. 1950) (holding that an "overriding royalty of one-fifth of all oil produced" and an interest in net profits provided an economic interest).

Such a durable stream of royalties is the quintessential and indeed textbook example of an economic interest. A leading oil-and-gas treatise recognizes that a landowner who "leases his land to an oil company in a standard oil and gas transaction is considered to have an economic interest because of the retained royalty interest." Owen L. Anderson, John S. Dzienkowski, John S. Lowe, Robert J. Peroni, David E. Pierce, & Ernest E. Smith, Oil and Gas Law and Taxation (A Revision of Hemingway) 464–65 (2017);[4] *see also* Sneed, *supra*, at

---

[4] Unsurprisingly, five of the six authors of this treatise teach at law schools in Texas, four of them at the University of Texas School of Law. And Joseph Sneed, the author of a leading article on economic interest who would eventually become a judge on

No. 21-10373

355 (describing an interest "lasting for the productive life of the property" and entitling its holder to "beneficial enjoyment of income" as "plainly" an economic interest); Leonard Sargeant III, *Economic Interest and Depletion Allowance for Mining Contractors*, 20 WASH. & LEE L. REV. 322, 330 (1963) (observing that long-term royalty owners have an economic interest).

That the retained royalties reflect not only the value of oil and gas at the wellhead, but also the significant value that Exxon adds through transportation and processing, does not dissolve Qatar's and Malaysia's economic interest. *See Estate of Weinert v. Comm'r*, 294 F.2d 750, 764–65 (5th Cir. 1961) (holding that income from postextraction operations did not destroy an economic interest because those operations were "indispensable" to the eventual sale of petroleum products). What matters is whether the payments depend on minerals. That is why arrangements like minimum guaranteed payments, net-profit payments, and advance bonuses also result in an economic interest. *See Wood*, 377 F.2d at 307 (stating that "minimum guaranteed royalty provisions" do not "render payment dependent upon a factor other than extraction or production"); *Kirby Petrol. Co. v. Comm'r*, 326 U.S. 599, 604 (1946) (explaining that an "economic interest in the oil is no less when [the] right is to share a net profit" because the "only source of payment" is the oil); *Burnet v. Harmel*, 287 U.S. 103, 111 (1932) (holding that bonuses and royalties are not treated differently in the economic-interest analysis). Although none of these configurations involve the long-term royalty streams that typify an economic interest, in each the sole source of return is minerals. Qatar's and Malaysia's running royalties, which likewise

---

the Ninth Circuit, also had deep ties to Texas's flagship university, first as a law student and later as a member of the law faculty. *See* Sneed, *supra*, at 307 n.a1.

rely on mineral production, are closer to the classic mineral lease than these other examples.[5]

Exxon acknowledges that it has found no case (nor have we) holding that a party with an unlimited royalty stream lacks an economic interest in the minerals it will still profit from. It instead points to a subset of lease/sale cases in which the transferor receives not a running royalty but instead a fixed sum called a production payment.

Production payments are not traditional royalties. Unlike running royalties, which "extend to the entire oil and gas resource content of the land," production payments provide a "right to income for a limited time or amount." *Caldwell v. Campbell*, 218 F.2d 567, 569 n.5 (5th Cir. 1955); *see also Herbel v. Comm'r*, 129 F.3d 788, 790 (5th Cir. 1997) (noting that production payments last "shorter than the expected life of the property" (quoting *Carr Staley, Inc. v. United States*, 496 F.2d 1366, 1367 (5th Cir. 1974))); ANDERSON ET AL., *supra*, at 641 (noting that production payments are twists on traditional royalties and describing them as "limited by a specific dollar amount, quantity of mineral extracted, or period of time"). Production payments thus do not provide the economic upside of traditional royalties. A $5,000 production payment is worth $5,000, no matter whether the drilling takes place on a gusher or a dry well. Indeed, the fixed-sum nature of

---

[5] To be sure, not everyone who benefits financially from the extraction of minerals has an economic interest. Take for example an operator of a gas processing plant who is contractually "entitled to a delivery of the gas" produced at certain wells. *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 367 (1938). The operator certainly "obtain[s] an economic advantage from the production of the gas" through its contracts. *Id.* at 368. But this operator cannot satisfy the first *Palmer* requirement because it has no capital investment in the gas wells. *See* 287 U.S. at 557. It thus has "no interest in the gas in place." *Bankline*, 303 U.S. at 368. It is a mere contractual beneficiary of the extraction of gas. *See also Scofield v. La Gloria Oil & Gas Co.*, 268 F.2d 699, 709 (5th Cir. 1959) (relying on *Bankline* to arrive at a similar holding).

production payments is the hallmark of a mineral *sale*—the transfer of mineral interests for a set price. *See Whitehead*, 555 F.2d at 1292–94; *Rhodes v. United States*, 464 F.2d 1307, 1311 (5th Cir. 1972); 5 MERTENS, *supra*, at § 24:17 (exploring the effect of fixed prices). In simple terms, the production payment is the sales price. *See, e.g.*, *Anderson*, 310 U.S. at 413; *Christie v. United States*, 436 F.2d 1216, 1221 (5th Cir. 1971).

The wrinkle is that production payments, like traditional royalties, can reflect income from minerals. *See Thomas v. Perkins*, 301 U.S. 655, 657–663 (1937); *Herbel*, 129 F.3d at 790 (defining a production payment as the "right to a specified share or production from a mineral property" (quoting *Carr Staley*, 496 F.2d at 1367)). Whether production payments leave the transferor with an economic interest in the minerals thus requires closer scrutiny than the set prices suggest.

Consider *Anderson*, 310 U.S. 404. It involved a company's selling its mineral interests for $160,000. *Id.* at 405. Of that price, $110,000 was structured as a production payment. *Id.* at 406. At first blush, this transaction resembles a sale because of the fixed sales price. *See Helvering v. Elbe Oil Land Dev. Co.*, 303 U.S. 372, 375 (1938). But the production payment could have been satisfied with income "derived from oil and gas produced." *Anderson*, 310 U.S. at 405–06. The potential connection to oil and gas made it a closer call whether the transaction depended on mineral production. *See id.* at 410 (noting that an oil payment right "resembles the right to cash payments more closely than the right to royalty payments," but recognizing that the payment "depend[s] upon the production of oil").

A bright-line rule answers the tricky question of whether production payments—which carry set prices but allow mineral extraction to help pay them—support an economic interest. When a payment can be satisfied by

an alternative, nonmineral source of income, the recipient lacks an economic interest because minerals are not the sole source of recovery. *See id.*

An alternative source of recovery is why *Anderson* deemed the transaction at issue a sale despite a production payment that could also have been satisfied by oil. *Id.* at 413. The production payment could come from a sale of the land itself—a source other than minerals—so the payment did not depend on mineral production. *Id.* at 405–06, 412–13 (explaining that the production payment could have alternatively been satisfied "from the sale of fee title" to the property). The "reservation of this additional type of security" for the production payment dissolved the economic interest. *Id.*; *see also Christie*, 436 F.2d at 1217, 1221 (holding that a production payment of $5,235.24 that could be satisfied by salvage value of equipment precluded economic interest); *Comm'r v. Estate of Donnell*, 417 F.2d 106, 115 (5th Cir. 1969) (holding that a production payment of $35,275 that was backed by a personal guaranty did not create an economic interest); *see also* 26 C.F.R. § 1.636-3 ("A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral property is not an economic interest in mineral in place.").

Only when production payments can be satisfied solely by income from minerals do they support an economic interest. Thus, a production payment of $395,000 payable solely out of oil resulted in a transferor's retaining an economic interest. *Perkins*, 301 U.S. at 657–663. The language in the cases that a taxpayer has an economic interest only if he looks "*solely* to the extraction of oil or gas for a return of his capital," *Sw. Expl. Co.*, 350 U.S. at 314 (emphasis added), reflects this divide between production payments backed by alternative sources and those that rely solely on minerals.

But this discussion of production-payment cases is a detour. *See* Anderson et al., *supra*, at 465–66 (treating production payments as deviations from royalties). This is not a production-payment case because Qatar and Malaysia receive no guaranteed price based on Exxon's mineral extraction.

Exxon nonetheless latches on to the "solely" requirement as applied in the production-payment nook of oil-and-gas law and refashions it as a magic bullet for the entire edifice. Exxon's preferred rule is that landowners who lease property in exchange for oil royalties have no economic interest if they secure other contractual benefits in the same bargain. That would mean Qatar and Malaysia lack an economic interest in minerals because they receive additional sources of income besides mineral royalties— infrastructure, access to markets, and in Malaysia's case, abandonment cess payments.

Exxon's view that an economic interest depends on whether a party is entitled to oil payments and nothing else misses the mark. The correct question is whether a party has a right to any income that depends solely on the extraction and sale of minerals. *See Kirby*, 326 U.S. at 604.

The "sales" cases that Exxon relies on prove this point. Each found no economic interest because the production payment could have been satisfied by minerals or nonmineral sources. *See Anderson*, 310 U.S. at 413; *Christie*, 436 F.2d at 1221; *Donnell*, 417 F.2d at 115. Those who held the right to income had limited downside. They could expect to get paid with or without extraction. In contrast, Qatar's and Malaysia's right to income through royalties depends solely on minerals. Again, without oil and gas,

Qatar and Malaysia receive no royalties. That the countries are entitled to supplemental income is irrelevant.[6]

Were the rule as Exxon sees it, parties could manipulate the line between leases and sales. A lessee who seeks additional depletion deductions and a lessor who wants favorable capital-gains treatment could transform their lease into a sale by adding unrelated nonmineral payments to their agreement. Tax treatment would depend on how many transactions are cobbled into one contract. Focusing on the source of individual payment obligations like royalties prevents such gamesmanship. Supplemental sources of income in multifaceted transactions—for example, the infrastructure and abandonment cess payments here—receive their own tax treatment.

Exxon argues that *Anderson* bars our "unworkable" approach of "dis-aggregating" its agreements and examining only the source of the royalties. This prohibition, in Exxon's view, comes from *Anderson*'s directive that courts should treat payments "as a whole" rather than "distributively []

---

[6] Of course, the "solely" requirement applies in cases not involving production payments. *See, e.g.*, *Sw. Expl. Co.*, 350 U.S. at 314. This case would be different if the royalties themselves could be satisfied by another source besides petroleum. In that scenario, Qatar and Malaysia would have no right to income dependent solely on minerals. *See Anderson*, 310 U.S. at 413 (suggesting that the "reservation in a lease of oil payment rights together with a personal guarantee by the lessee that such payments shall at all events equal the specified sum[s]" does not constitute an economic interest).

Exxon argues that the countries' entitlement to damages for breach of contract fits the mold of an alternative source of income. But damages, which by their nature are too indefinite and unpredictable to constitute an alternative source, are the standard remedy for any breach of contract. If the availability of damages dissolves an economic interest, mineral leases would be extinct. *See Wood*, 377 F.2d at 307 n.19 (explaining that, at least in Texas, mineral leases create "an implied covenant to produce").

depending upon the source from which each dollar is derived." *See* 310 U.S. at 413.

Exxon misreads *Anderson*. The rule it quotes means only that tax treatment does not depend on whether a production payment is actually paid from minerals or an alternative source. If a production payment *can* be satisfied by an alternative source, the transferor has no economic interest. In such a case of uncertainty about where the production payment will come from, the recipient does not own a stake in the minerals. This is the "workable rule" to which *Anderson* referred. *Id.*; *see also* Sneed, *supra*, at 328 (advising that the *Anderson* rule is limited and that "a right to look to mineral produced and sold should not be deprived of the economic-interest status simply because the holder of such a right is given in the same transaction the right to sell personal services to the obligor for a fixed fee").

Exxon's position is irreconcilable with decades of cases recognizing that royalties support an economic interest. *See supra* p.7. Indeed, *Anderson* itself recognizes the basic rule that the "holder of a royalty interest—that is, a right to receive a specified percentage of all oil and gas produced during the term of the lease—is deemed to have 'an economic interest.'" 310 U.S. at 409 (quoting *Palmer*, 287 U.S. at 557). That rule resolves this case.

Exxon also cannot explain cases in which we have recognized an economic interest despite the presence of both royalties dependent on oil and separate sources of income. *Weinert*, 294 F.2d at 764–65; *Gray*, 183 F.2d at 330. The best example is *Gray*. There, we did not hesitate to hold that a taxpayer's owning royalties along with an interest in a gas processing and cycling plant "manifestly resulted in the reservation of an 'economic interest' in the oil and gas in place." *Gray*, 183 F.2d at 331. Just as the additional source of income did not eliminate the taxpayer's economic interest in *Gray*, it does not do so here.

Qatar and Malaysia thus have an economic interest in the minerals being extracted. That means the agreements are as Exxon originally described them: leases.

## C

That brings us to whether the IRS's $200 million penalty should stand. The IRS can levy a penalty if "a claim for refund . . . is made for an excessive amount." 26 U.S.C. § 6676(a) (2017) (amended 2018). But claims with a "reasonable basis" do not warrant a penalty. *Id.* To satisfy this standard, a taxpayer's position must be "reasonably based on one or more of" a number of authorities, 26 C.F.R. § 1.6662-3(b)(3), including caselaw, statutes, regulations, private letter rulings, and technical advice memoranda, *id.* § 1.6662-4(d)(3). This standard is relatively high but less stringent than other IRS standards like the substantial-authority standard, which requires that "the weight of the authorities supporting treatment of an item must be substantial in relation to the weight of those supporting contrary treatment." *Chemtech Royalty Assocs., L.P. v. United States*, 823 F.3d 282, 290 (5th Cir. 2016). Whether a refund claim has a reasonable basis is reviewed de novo. *See id.* at 287.

The district court emphasized the complex nature of this case and "readily" held that Exxon's position is reasonably based on legal authority. It had to hold a bench trial to resolve the case.

We see some merit in the government's view that Exxon did not have a reasonable basis for its position. As we have said, no case has ever held that a traditional royalty does not leave the transferor with an economic interest in the oil from which it can still profit.

Although Exxon's position is close to the "reasonable basis" line, we end up agreeing with the district court's assessment. The lease/sale issue is a notoriously complex area of tax law. One of our opinions quips that it

involves "occult mysteries." *See Donnell*, 417 F.2d at 108.  And Exxon is not the only one to read the "solely" requirement from *Anderson* and *Christie* so broadly.  *See* Internal Revenue Serv., Tech. Advice Mem. 199918002, 1999 WL 283075 (Jan. 15, 1999) (loosely reading *Anderson* and *Christie* as holding that no economic interest exists when "there is a possibility of sharing in income not solely derived from extraction").  *Christie*, in which we held that no economic interest existed even though oil money ended up satisfying the production payment in whole (because there was the possibility the payment could have come from the salvage value of the drilling equipment used), is especially susceptible to a broad reading.  *See* 436 F.2d at 1218.

The published cases on which the government relies do not require a different result.  One uses the higher substantial-authority standard.  *See NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1013 (5th Cir. 2014).  And the other is about subjective reliance on relevant legal authorities.  *See Wells Fargo & Co. v. United States*, 957 F.3d 840, 854 (8th Cir. 2020).  Although the penalty question presents a close call, the district court correctly granted Exxon a refund on this issue.

## II

Exxon claims that it made yet another mistake in its original tax returns.  We turn now to that purported blunder.  The issue is which amount of excise tax Exxon can deduct from its gross income: (1) the lesser amount it actually paid after claiming a renewable-fuel credit or (2) the greater amount it would have paid without the credit.

A

1

Congress levies an excise tax on fuels like gasoline. 26 U.S.C. § 4081(a)(1)(A). The tax funds the Highway Trust Fund, which pays for America's highways. 26 U.S.C. § 9503(b)(1).

Congress tinkers with the excise tax to serve another of its goals—encouraging renewable fuels. In years past, Congress has tried to exempt renewable gasoline from the excise tax. *See* Energy Tax Act of 1978, Pub. L. No. 95-618, 92 Stat. 3174, 3185. It has also tried to tax renewable gasoline at a lower rate than regular gasoline. Highway Improvement Act of 1982, Pub. L. No. 97-424, 96 Stat. 2097, 2171. But these experiments had the unintended, though predictable, consequence of depleting the Highway Trust Fund.

The American Jobs Creation Act of 2004 fixed this problem, incentivizing renewable fuels while also ensuring the viability of the Highway Trust Fund. Pub. L. No. 108-357, § 301, 118 Stat. 1418. The Act repealed the reduced excise-tax rate for renewable gasoline. *See* 118 Stat. at 1461. Instead, Congress provided that taxpayers who produced renewable gasoline could claim a "credit against" their excise tax. *Id.* at 1459 (codified at 26 U.S.C. § 6426(a)). Congress also provided an option for this credit to be received by the producer in the form of a direct payment, but only to the extent that the credit exceeds the amount allowed against excise tax. *Id.* at 1462 (codified at 26 U.S.C. § 6427(e)). And it appropriated money for the Highway Trust Fund "without reduction for [the credit.]" *Id.* (codified at 26 U.S.C. § 9503(b)(1)). These fixes appropriated the full amount of excise taxes to the Highway Trust Fund while also benefitting those who produced renewable fuels.

2

Paying excise tax reduces income tax. Excise tax paid on fuel is deductible from gross income. *See* 26 U.S.C. § 162; 26 C.F.R. § 1.61-3.

In tax years 2008 and 2009, Exxon's original excise-tax liability was roughly $6 billion. But Exxon also produced renewable fuels. It was thus eligible for a $960 million credit. Exxon applied the credit against its original $6 billion liability and paid a reduced excise tax of around $5 billion. On its original tax returns, Exxon deducted that lesser amount from its gross income rather than the $6 billion-odd it would have owed in excise taxes had it not claimed the credit.

But just as it did with the lease/sale issue, Exxon had a change of heart—this one worth $300 million. Exxon filed amended returns that deducted $6 billion in excise tax, unreduced by the credit for renewables. In other words, Exxon increased its excise-tax deduction, and thus reduced its taxable income, by $960 million. That translated to a $300 million reduction in tax owed.

The IRS was not persuaded. It rejected the refund claim, informing Exxon that "[s]ince you already used the Credit to reduce the Excise Tax, you are not allowed to use the same Credit[] to . . . decrease taxable income." The district court agreed with the IRS.

B

The statute says that there "shall be allowed" a "credit . . . against" the fuel excise tax. 26 U.S.C. § 6426(a)(1). The issue is the meaning of "credit." If the credit *reduces* excise tax, the taxpayer can deduct only the amount of excise tax remaining after subtracting the credit—the amount it actually paid. But if, as Exxon contends, the credit *satisfies* or *pays* the excise tax, it does not alter the amount of tax imposed. And if that is the case, then

the taxpayer could deduct the full amount of excise tax imposed without a reduction for the credit.

Exxon is not the only oil company making this argument. Its gambit is the latest installment in a series of nearly identical claims that companies have filed nationwide. We join the unanimous chorus—judges who comprise two courts of appeals and three district courts (9-0 for those keeping score)—to hold that Exxon's credit reduced its excise-tax liability such that it can only deduct the excise tax it paid out of pocket. *See Delek US Holdings, Inc. v. United States*, 32 F.4th 495 (6th Cir. 2022); *Sunoco, Inc. v. United States*, 908 F.3d 710 (Fed. Cir. 2018); *Exxon Mobil Corp. v. United States*, No. 3:16-CV-2921-N, 2018 WL 4178776 (N.D. Tex. Aug. 8, 2018); *Delek US Holdings, Inc. v. United States*, 515 F. Supp. 3d 812 (M.D. Tenn. 2021); *Sunoco, Inc. v. United States*, 129 Fed. Cl. 322 (2016); *see also ETC Sunoco Holdings, LLC v. United States*, 36 F.4th 646 (5th Cir. 2022) (rejecting Sunoco's attempts to relitigate the case it lost before the Federal Circuit).

Our analysis begins and ends with the ordinary meaning of "credit." To borrow from the private sector, everyone recognizes that coupons lower the cost of goods by reducing sticker prices. Credits do the same thing. As we have explained, "[a] tax credit is the public sector equivalent of a coupon; it *reduces* the amount that is otherwise owed." *United States v. Hoffman*, 901 F.3d 523, 538 (5th Cir. 2018) (emphasis added). Dictionaries recognize that credits reduce liability. *Tax Credit*, BLACK'S LAW DICTIONARY 1501 (8th ed. 2004) ("An amount subtracted directly from one's total tax liability, dollar for dollar, as opposed to a deduction from gross income."); *Credit*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 294 (11th ed. 2003) ("[A] deduction from an amount otherwise due."). Other courts have too. *See R.H. Donnelley Corp. v. United States*, 641 F.3d 70, 74 (4th Cir. 2011) ("[T]he Code allows taxpayers to reduce their tax liability dollar-for-dollar by claiming credits."); *Telecom*USA, Inc. v. United States*, 192 F.3d 1068,

1079 (D.C. Cir. 1999) ("[A] tax credit is a dollar-for-dollar reduction in a taxpayer's tax liability."). Taxpayers who receive the childcare credit would no doubt consider the post-credit amount to be their tax liability. It follows from this commonly understood meaning of "credit" that when the section 6426(a) credit is applied against excise tax, it reduces that tax. *See Delek*, 32 F.4th at 498 (discerning the ordinary meaning of credit to conclude that the credit reduces excise-tax liability); *Sunoco*, 908 F.3d at 716 (same).

Exxon and amicus argue that our reading is inconsistent with section 6427(e), which allows producers to receive the renewable-fuel credit as a tax-free direct payment. *See* 26 U.S.C. § 6427(e)(1). But fuel producers cannot claim direct payments *in lieu* of excise-tax reductions. They must first apply the credit against excise-tax liability. *See* 26 U.S.C. § 6426(a)(1) (stating that there "*shall* be allowed" a credit against excise tax) (emphasis added); *Delek*, 32 F.4th at 500–01 (emphasizing that the mandatory term "shall" requires taxpayers to first apply the credit against their excise tax). Only if their credit exceeds their excise tax can they receive the excess as a direct payment. *See* 26 U.S.C. § 6427(e)(3) ("No amount shall be payable . . . with respect to which an amount is allowed as a credit under section 6426."). Indeed, for years Exxon applied its credit against its excise tax without first demanding a direct payment. Accordingly, our reading does not conflict with section 6427(e).

Exxon makes additional arguments, but we agree with the detailed reasoning of the Federal and Sixth Circuits rejecting them. *See Delek*, 32 F.4th at 499–502; *Sunoco*, 908 F.3d at 716–17. There is no need to say again what has already been said well.

The text is clear: Exxon's renewable-fuel credit reduced its excise tax. It can deduct only the reduced amount.

No. 21-10373

\* \* \*

Exxon was right the first time it filed its returns.  We AFFIRM.